[No. H035246. Sixth Dist. Sept. 8, 2011.]

FRESH EXPRESS INCORPORATED, Plaintiff and Appellant, v. BEAZLEY SYNDICATE 2623/623 AT LLOYD'S et al., Defendants and Appellants.

COUNSEL

Kirkland & Ellis, Christopher William Keegan, Andrew R. Running, Andrew T. Dustin; Law Office of Russell J. Hanlon and Russell J. Hanlon for Plaintiff and Appellant.

Quinn Emanuel Urquhart & Sullivan and Fred Gilbert Bennett for Defendants and Appellants.

OPINION

**MIHARA, J.**—In September 2006, the United States Food and Drug Administration (the FDA) issued an "alert" advising that "consumers not eat bagged fresh spinach" due to "an outbreak of E. coli 0157:H7" that was possibly linked to consumption of bagged fresh spinach. The FDA advisory disclosed that there had already been reports of 50 "cases of illness" and "one death." The FDA withdrew its advisory two weeks later after the source of the outbreak had been identified.

Plaintiff Fresh Express Incorporated (Fresh Express), which markets bagged fresh spinach and other leafy greens, was not the source of the E. coli outbreak, but it suffered a significant loss of business in the wake of the FDA advisory. Fresh Express sought to recover these losses under its "TotalRe-call+" insurance policy issued by defendants Beazley Syndicate 2623/623 at Lloyd's and QBE Insurance (Europe) Limited (collectively Beazley). Beazley denied Fresh Express's claim, and Fresh Express filed a breach of contract action against Beazley. Fresh Express prevailed at trial and recovered the $12 million policy limit.

Beazley appeals and claims that, because the trial court erroneously defined the "Insured Event" under the policy as "the E. coli outbreak," the court awarded Fresh Express damages for losses. that did not come within the policy's coverage for losses that were the "direct result" of an "Insured Event" of "Accidental Contamination." Beazley also contends that the trial court's alternative theory that Fresh Express's losses arose from "Accidental

Contamination" is not supported by substantial evidence. Fresh Express cross-appeals from the trial court's denial of its request for prejudgment interest. We agree with Beazley that the trial court erred in defining the "Insured Event." We also conclude that the trial court's alternative theory lacks substantial evidentiary support. Therefore, we reverse the judgment and dismiss Fresh Express's cross-appeal as moot.

## I. Factual Background

### A. The Insurance Policy

Beazley issued a "TotalRecall+ -Brand Protection" policy to Fresh Express which took effect on August 29, 2005, and expired on September 29, 2006. The policy "type" was identified as "Malicious Contamination, Accidental Contamination and Products Extortion Insurance." Only the "Accidental Contamination" coverage is at issue here. The policy, for which Fresh Express paid a premium of $300,054.79, had a liability limit for "Accidental Contamination" of $12 million "per Insured Event and in the aggregate."

The policy's "INSURING AGREEMENT" provided that Beazley would "reimburse [Fresh Express] for losses as specified in this Policy arising out of Insured Events . . . incurred by [Fresh Express] . . . only where such losses arise because of: [¶] . . . [¶] Section Two: Accidental Contamination, covering: [¶] Pre-Recall Expenses, Recall Expenses, Customer Recall Expenses, Product Rehabilitation, Loss of Gross Profits and Increased Cost of Working" and "Crisis Response fees . . . ."[1] "Accidental Contamination" was defined by the policy as: "Error by [Fresh Express] in the manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging or labelling (including instructions for use) of any Insured Products or error by [Fresh Express] in the storage or distribution of any Insured Products whilst in the care or custody of [Fresh Express] which causes [Fresh Express] to have reasonable cause to believe that the use or consumption of such Insured Products has led or would lead to: [¶] i) bodily injury, sickness, disease or death of any person(s) or animal(s) physically manifesting itself by way of clear, obvious or visible symptoms within 120 days of use or consumption or [¶] ii) physical damage to or destruction of tangible property (other than the Insured Products themselves)." "Insured Event" was defined by the policy as "Malicious Contamination, Products Extortion or Accidental Contamination."

"Recall Expenses" were defined as "[t]hose reasonable, customary and necessary expenses itemised below which are incurred by [Fresh Express]

---

[1] All original boldface has been omitted from quotations to enhance readability.

and which are devoted exclusively to the purpose of the recall or withdrawal of Contaminated Product(s) arising out of an Insured Event."[2] "Product Rehabilitation" was defined as "[s]ales and marketing expenses, including reasonable and customary shelf space and slotting fees, up to an amount forming part of but not exceeding the amount in Item 9 of the Schedule, necessarily incurred by [Fresh Express] in order to meet legal rehabilitation requirements and/or to reasonably re-establish the sales level and the market share of those Insured Product(s) affected by an Insured Event to the level reasonably projected, taking into account the reasonable projection had no Insured Event occurred and all material changes in market conditions of any nature whatsoever, prior to the Insured Event."[3]

"Gross Profits" was defined as "Loss of Gross Profit, incurred as a result of an actual and ascertainable reduction in [Fresh Express's] sales revenue caused solely and directly by an Insured Event for the period:- [¶] i) [three months], following discovery of the Insured Event, or [¶] during which [Fresh Express's] sales revenue remains less than the level that would have been reasonably projected had the Insured Event not occurred [¶] whichever shall be the period first to expire. [¶] Gross Profit shall mean the difference between:- [¶] a) [Fresh Express's] revenue that would have been reasonably projected, but which has been lost solely and directly as a result of an Insured Event, and [¶] b) the variable costs that would have been incurred, but which have been saved as a result of not making those sales (including the cost of raw materials, and all other saved costs)."

The policy provided for a number of exclusions. It excluded: "a) Any expenses incurred by [Fresh Express] or any loss of Gross Profit for any reason other than as a direct result of an Insured Event"; "g) Any governmental ban of or loss of public confidence in any Insured Product or any material or substance used in any Insured Products"; and "i) Loss or damage directly or indirectly occasioned by . . . the order of any governmental or public or local authority."

### B. The September 2006 E. Coli 0157:H7 Outbreak and Its Aftermath

E. coli 0157:H7 is a "very virulent organism" and an "extremely dangerous pathogen" that causes "life-threatening" illness. Cattle are the primary source of E. coli 0157:H7 contamination, but the pathogen may also be spread by wild animals and birds. This pathogen can attach to fresh produce, and it

---

[2] "Contaminated Product(s)" were defined by the policy as "[t]hose Insured Products which have been the subject of an Insured Event."

[3] Product rehabilitation expenses were limited to 25 percent of the $12 million policy limit.

cannot be removed in processing or washed off by the consumer. Therefore, E. coli 0157:H7 contamination poses a serious risk to consumers of fresh leafy greens that are eaten raw. A very small amount of contaminated produce can cause the contamination of a large amount of produce if the contaminated produce is processed in the same processing facility as previously uncontaminated produce. There are many strains of E. coli 0157:H7. Laboratory testing can distinguish between these strains, which can help in tracking an outbreak to a source.

In 2006, Fresh Express was the largest bagged spinach producer, and Dole was the only other producer with a large market share.[4] Fresh Express did not own any farms. It purchased all of its produce. Fresh Express's primary spinach supplier was Fresh Farms. Although Fresh Farms grew most of its own produce, it also sometimes made "spot purchases" from other growers. Fresh Farms followed Fresh Express's good agricultural practices (GAP's), which were designed to reduce the risk of contamination.

Dr. Michael Osterholm was an epidemiologist who began working as a food safety consultant to Fresh Express in 1999. Fresh Express had never been involved in a food-borne outbreak, which Osterholm attributed to Fresh Express's requirement that its suppliers follow its GAP's. While good manufacturing practices (GMP's) at the processing plant can help to reduce the impact of contamination, GMP's are inadequate to exclude contaminated produce. GAP's are the primary bastion against contamination. Osterholm considered it a "serious and major error" to permit produce to enter the processing plant if the produce was not the subject of a preharvest audit, which is part of Fresh Express's GAP's, because that may allow contaminated produce to enter the system and spread that contamination.

Although Fresh Farms supplied most of Fresh Express's spinach needs, Fresh Express occasionally needed more spinach than Fresh Farms could supply. This situation led to Fresh Express making "spot purchases." Fresh Express had a company policy regarding "spot purchases." There were two types of spot purchases: those from Fresh Express's certified suppliers and those from suppliers who were not certified suppliers for Fresh Express. Fresh Express's certified suppliers were those that Fresh Express had determined followed its GAP's. Before a supplier could become a certified supplier, Fresh Express would perform a food safety audit to ensure that the supplier was following Fresh Express's GAP's. Fresh Express's GAP's did not permit produce to be grown within a mile of a cattle yard because cattle are the primary source of E. coli contamination. If a supplier was not one of Fresh Express's certified suppliers, Fresh Express's company policy required

---

[4] Fresh Express's sales exceed $1 billion a year. It is a wholly owned subsidiary of Chiquita Brands.

that Fresh Express perform a preharvest food safety audit before making a spot purchase from that supplier. A preharvest food safety audit is a field visit during which a visual inspection of the field is made to assess possible sources of contamination. If obvious sources of potential contamination were seen during a preharvest food safety audit of a field, Fresh Express's company policy was that it would not purchase produce from that field.

Between July 31, 2006, and August 21, 2006, Fresh Express made 13 "spot purchases" of spinach. Some of these purchases violated Fresh Express's company policies.[5] In the first week of August 2006, Fresh Express made several "blind" spot purchases of spinach from Seco Packing, which was not one of Fresh Express's certified growers. This spinach had been grown at Bloomfield Farms. No preharvest food safety audit had been conducted at Bloomfield Farms to assess sources of potential contamination. In the third week of August 2006, Fresh Express three times purchased spinach from Braga Farms, one of Fresh Express's certified suppliers, that had been grown on lot 4 at Eade Ranch.[6] Fresh Express had inspected Eade Ranch in October 2005 and July 2006 and determined that certain lots, including lot 4, at Eade Ranch were within a mile of a cattle yard. Therefore, Fresh Express had determined that its GAP's prohibited purchasing produce grown on those lots.[7] These August 2006 Seco Packing and Braga Farms purchases violated Fresh Express's food safety policies. After August 21, 2006, all of Fresh Express's spinach purchases were from Fresh Farms, its primary certified supplier.

Between September 8 and September 12, 2006, the Centers for Disease Control and Prevention (the CDC) was informed by investigators in two states that they suspected "bagged fresh spinach" was the source of an E. coli 0157:H7 outbreak. On September 12, the CDC confirmed that E. coli 0157:H7 infections in multiple states were from the same strain of the pathogen. A number of the infected patients reported having consumed Dole bagged baby spinach in the week before becoming ill.

The FDA became "involved" on September 13, 2006, by which time a third state had made a similar report.[8] On September 14, the FDA learned that the strain of E. coli 0157:H7 involved in the outbreak appeared to be

---

[5] The rest of these spot purchases were either from certified suppliers or were approved after a preharvest food safety audit.

[6] Braga Farms is a large grower with many different ranches.

[7] The October 2005 inspection was to evaluate a proposed spot purchase. The spot purchase was rejected due to the lot's location in relation to the cattle yard. The July 2006 inspection was a ranch survey as part of an audit of Fresh Express's certified supplier Braga Farms.

[8] Robert Brackett was the "director of Food Safety and Applied Nutrition" at the FDA, and he "managed" the FDA's response to the E. coli outbreak in September 2006. He was

"more virulent" than other strains of E. coli 0157:H7. At that point, there were 45 reported cases, and they continued to appear to be linked to "bagged fresh spinach." The outbreak was "a nationwide event" and "involved many more people than one would typically see from a produce-borne outbreak." The constantly increasing number of cases was "quite alarming" to the FDA.

On September 14, the FDA contacted Fresh Express and two other spinach processors, told them that the FDA would be issuing an advisory, and "recommend[ed] that [they] take steps to recall." The FDA also sent investigators to the processing facilities of these three spinach processors. At that point, the FDA "had no idea which brands" were responsible for the outbreak, so it lacked the authority to do anything more than issue an advisory.

On September 14, the FDA issued a "no consumption advisory" which advised that "consumers not eat bagged fresh spinach" due to "an outbreak of E. coli 0157:H7" that was possibly linked to consumption of bagged fresh spinach. The FDA advisory received "extreme media coverage" and became "one of the major news stories in the United States . . . ." Within 24 hours, bagged spinach had been completely removed from grocery stores throughout the United States. The FDA had never before issued such a broad advisory regarding a commodity. A no-consumption advisory was issued because E. coli 0157:H7 could not be removed by washing the spinach. The FDA's advisory did not prevent producers from legally marketing fresh bagged spinach. The FDA did not have the authority to ban the sale of spinach unless it could "show that a particular brand or particular lot is adulterated . . . ."

Most spinach processors responded to the advisory by withdrawing their products from the market; that is, they stopped sending spinach to retailers but did not recall the spinach that had already reached retailers. Within a few hours of the FDA's advisory, Fresh Express decided to stop harvesting, processing, and distributing spinach products due to the FDA advisory and the resulting loss of public confidence in spinach products. Although the FDA advisory said nothing about nonspinach products, there was also an immediate "big consumption drop" in all leafy greens.

After the FDA issued the advisory, Fresh Express reviewed its supplier records and discovered that 2 percent of the spinach it had processed in the prior 60 days had been purchased from growers other than Fresh Farms and could have been from growers who also supplied Dole.[9] On September 15, Fresh Express wrote to the FDA and sought permission to, "at the earliest

---

"responsible for the entire response" of the FDA to the September 2006 E. coli outbreak. Brackett was the only FDA official who testified at trial.

[9] Fresh Farms had not supplied any spinach to Dole during the relevant period.

possible time, . . . continue to provide (with your blessing) fresh spinach products to our customers and consumers."[10] Fresh Express stated that it had "halted all spot purchases" from suppliers other than its "certified supplier" as of August 21 pursuant to its new company policy of using raw products from only its primary suppliers. Although Fresh Express's letter to the FDA mentioned "spot purchases," Fresh Express did not disclose to the FDA any concerns about or even the fact of the Braga Farms/Eade Ranch lot 4 purchases or the Seco Packing/Bloomfield Farms purchases. Indeed, the letter did not mention any concerns about the spot purchases, but merely stated that Fresh Express's new policy was to make no spot purchases. The FDA did not grant Fresh Express's request.

On September 15, Natural Selection Foods (NSF) voluntarily recalled its spinach, which was marketed under the Dole label. Although the FDA had identified NSF as a source of the outbreak, the FDA continued to investigate the sources of NSF's spinach, as it was possible that other brands had used the same spinach suppliers as NSF. By September 15, there were 94 cases of infection, and the FDA's epidemiologist reported that "this [was] a particularly hot strain" of E. coli 0157:H7.

On September 16 and 19, infected individuals implicated Fresh Express as a possible source of the spinach they had consumed. This patient identification information was the "primary" reason that the FDA believed at that point that Fresh Express was "implicated in the outbreak." Fresh Express spinach appeared to be linked to two cases in Kentucky. There were "these cases in Kentucky that looked like they were related to Fresh Express, and [the FDA was not] going to release [Fresh Express] from the advisory until [the FDA] could confirm that they [(the Kentucky cases)] were not from their product." The FDA was also concerned that it had been unable to "verify the source" of Fresh Express's spinach and "assure that the sourcing of the product by Fresh Express wasn't one of the implicated lots." "Until we could specifically say they were not involved, they would have been considered to be still suspect."

---

[10] Osterholm testified that, had Fresh Express not made the spot purchases from Braga Farms/Eade Ranch lot 4 and Seco Packing/Bloomfield Farms, he "would have been very prepared on the evening of September 15th to argue that case with the highest levels of the FDA that Fresh Express should not have been included" in the advisory. Because of these spot purchases, he had "no confidence" in Fresh Express's product during the relevant time period. He did argue to the FDA that Fresh Express should be permitted to market spinach from Fresh Farms, but this argument was weakened, in his opinion, by Fresh Express's possible implication in the outbreak. However, Osterholm denied that he had any involvement in crafting Fresh Express's September 15 letter to the FDA. Indeed, he thought the letter was pointless because "the FDA obviously were not going to approve Fresh Express coming back onto the market."

Lewis Watson, Fresh Express's vice-president for supply, testified that, in his opinion, in the absence of the Braga Farms and Seco Packing purchases, Fresh Express "would have made a strong case" to the FDA to support Fresh Express's request "to keep our product on the shelf."

On September 17, Fresh Express performed a "super scrub" on its plants. On September 18, the state asked Fresh Express to recall the specific lots of bagged spinach associated with the Kentucky cases. By this point, Fresh Express had discovered that its spot purchases during the relevant period had included purchases of spinach from Braga Farms/Eade Ranch lot 4 and from Seco Packing/Bloomfield Farms in August 2006 that had been done in violation of its company policies.[11] Fresh Express was aware that both Braga Farms and Bloomfield Farms had at times supplied Dole. Although Fresh Express was concerned that these two suppliers might also have supplied spinach to NSF, it did not inform the FDA or the state that Fresh Express had purchased from these particular suppliers, nor did it investigate whether NSF had purchased from these suppliers during the relevant period because Fresh Express did not consider this issue "important."[12] Fresh Express saw no need for a recall because the advisory had already resulted in all of the spinach being removed from stores by retailers, and consumers being advised not to eat spinach. Had that not occurred, Fresh Express would have recalled its spinach products due to these spot purchases. "[I]f there hadn't been a FDA advisory, we would have done a recall." Fresh Express believed that a recall would not have been as effective as the FDA's advisory and would have damaged the company's reputation. The specific lots of spinach associated with the Kentucky cases had been sourced from Fresh Farms, and had been processed in Georgia, not in California. There was not yet any confirmation that the Kentucky bags of spinach were actually contaminated with E. coli 0157:H7. Fresh Express rejected the state's request that it implement a voluntary recall of those specific lots because it was convinced that the advisory had already succeeded in disposing of the spinach associated with the Kentucky cases.

On September 21, the FDA limited the advisory to spinach grown in Monterey, San Benito, and Santa Clara Counties because all of the suspect produce had been sourced from those three counties. This included all of Fresh Express's spinach. The FDA remained concerned about Fresh Express's possible implication in the Kentucky cases. The FDA's position was that the advisory was not going to be lifted "for any of the brands" until the "public health establishment" was "very, very sure that the product was not contaminated."

Fresh Express notified Beazley on September 22, 2006, that it was making a claim under its "TotalRecall+" policy. At that point, the FDA was still

---

[11] The precise timing of Fresh Express's discovery of the details of its August 2006 spot purchase was unclear, but it uncovered these details no earlier than September 15.

[12] James Lugg, Fresh Express's food safety manager, who did not think this was "important," did disclose this information in October 2006, after the crisis was over. Osterholm, on the other hand, testified that he thought it *was* "important" for Fresh Express to know whether NSF had purchased from any of the same suppliers as Fresh Express.

investigating whether Fresh Express was linked to the outbreak. The CDC had just received and was still testing two bags of Fresh Express's spinach, which had been submitted by state health officials who considered these bags "suspect." The CDC had evidence that implicated NSF as the source of most of the cases, but it had not been able to eliminate other producers. Fresh Express had contacted the FDA "and said, 'We don't think that our product is suspect,' and we [(the FDA)] disagreed with them, and told them, yes, in fact, that we were not going to exclude them from the advisory at that time." Fresh Express's "position was, because of their practices, they were confident that their product was not involved . . . in the outbreak, but [the FDA was] unconvinced" due to the patient reports in the Kentucky cases.

Nothing had changed as of September 25. By September 26, infections were reported in 26 states. Around this time, the FDA became convinced that the outbreak was narrower than it had first thought. On September 28, Fresh Express learned that it had been cleared in the Kentucky cases.

By September 29, the FDA had determined the source of the outbreak was a single ranch associated with NSF. On September 29, 2006, the FDA announced that all of the spinach implicated in the outbreak had been traced to NSF and that spinach produced by other manufacturers had not been implicated. Paicines Ranch was ultimately determined to be the sole source of the outbreak. It was located within a mile of a cattle grazing area. E. coli 0157:H7 was subsequently found at Eade Ranch on a lot farther from the cattle feedlot than lot 4, but it was not the strain of E. coli 0157:H7 associated with the outbreak. Fresh Express had not purchased any spinach from Paicines Ranch or from the Eade Ranch lot where E. coli 0157:H7 was found.

Beazley ultimately denied Fresh Express's claim.

## II. Procedural Background

Fresh Express filed an action against Beazley for breach of contract and breach of the implied covenant of good faith and fair dealing. Fresh Express's first amended complaint alleged that Fresh Express's violations of its company policies in making the Braga Farms/Eade Ranch lot 4 and Seco Packing/Bloomfield Farms purchases were "Errors" under the policy which gave Fresh Express "reasonable cause to believe" that its products were "partially responsible for the E. coli outbreak." Fresh Express sought to recover the policy limit of $12 million plus prejudgment interest and attorney's fees.

The action was tried to the court. Fresh Express's two damages witnesses testified that Fresh Express had suffered $18.8 million in losses between

September 2006 and December 2006 "attributed to the E. coli outbreak," which they "assum[ed]" was the "insured event."[13] "We had no other explanation for the decrease in demand for our product, and the decrease in demand happened immediately after the E. coli outbreak." They did not distinguish between the "E. coli outbreak" and the FDA advisory; they proceeded on the assumption that the E. coli outbreak was an event that occurred on September 14, 2006, when the FDA issued its advisory. Fresh Express's damages witnesses made no attempt to attribute any of the losses to "errors" by Fresh Express or to any event other than the E. coli outbreak.

Fresh Express's damages witnesses identified eight categories of damages caused by the E. coli outbreak: $6 million in lost profits on spinach; $4.25 million in lost profits on nonspinach products; $2.1 million for contractual payments; $1.7 million for "in-field contractual obligation costs"; $1.7 million for customer credit memo costs; $1.5 million for facility centers disposal costs; $1.3 million in rebranding costs; and $125,000 for consultant costs.[14] These losses included the impact on both spinach and nonspinach products. This was done because the "E. coli outbreak" caused "a substantial decrease in sales" and "decrease in demand" for "all of our products, not just our spinach products."

The lost profits were calculated for the period from September 14, 2006, to December 13, 2006, because the policy limited lost profits to a three-month period. Fresh Express's damages expert attributed the "total disparity between" expected profits and actual profits to "the E. coli outbreak" because he saw no "other reasonable explanation for the deviation in sales." The "contractual payments" and "in-field contractual payment[s]" categories of damages consisted of the payments that Fresh Express was contractually required to make to farms for produce and the cost to destroy produce that Fresh Express did not require due to the decrease in demand caused by the E. coli outbreak. These two categories included payments associated with both spinach and nonspinach products. The credit memos category referred to the amounts that Fresh Express credited its customers with for produce that the customer had been unable to sell.[15] The disposal costs category was the cost of disposing of bagged spinach that had been at Fresh Express's "regional locations" at the time of the "E. coli outbreak" or was rejected by the customer. The rebranding costs were the costs Fresh Express incurred for a

---

[13] Tanios Viviani, Fresh Express's president, testified at trial that Fresh Express had lost $50 million as a result of "the outbreak" and the "FDA advisory."

[14] We use rounded numbers for convenience.

[15] The testimony was not entirely clear as to whether these credit memos included any nonspinach products. It appeared that they did not.

marketing campaign to "rebuild the brand," customer demand, and consumer confidence after the E. coli outbreak.[16]

In August 2009, the trial court issued a written ruling finding that Fresh Express was entitled to recover $12 million from Beazley. The court made the following findings in its August 2009 ruling. "Fresh Express' Quick Response Team ('QRT') assembled immediately upon learning of the outbreak and conducted investigations that determined Fresh Express had violated its own food safety policies and protocols in acquiring and processing raw product used in its fresh bagged spinach products. Because of these errors, the QRT found reasonable cause to believe that Fresh Express spinach products had led or would lead to its consumers becoming injured." The court concluded that Beazley had breached the insurance policy because Fresh Express had established " 'errors' within the meaning of the policy in the form of purchases from Seco Packing and Braga Eade Ranch in August 2006." "[S]ales of bagged fresh spinach without enforcing Fresh Express' GAP [(good agricultural practices)] standards through a food safety audit program would create an unacceptable risk of harm to others. Fresh Express' verification of GAP compliance through grower audits was an integral and inseparable part of its safe manufacturing practices." The court found that Fresh Express had "reasonable cause to believe that these errors . . . had led or would lead to bodily injury." As to Beazley's affirmative defenses, the court found inapplicable the exclusion regarding "a 'governmental ban' " because the FDA advisory "was not a ban." "Fresh Express' losses were not caused by the FDA Advisory or a loss of public confidence. Instead, it appeared that the ultimate cause of the losses suffered by Fresh Express was the 2006 E. coli outbreak, the 'Insured Event' in this case. To adopt [Beazley's] interpretation of the policy . . . would render the coverage provisions under the policy meaningless." The court found that Fresh Express had proven "that it suffered losses in excess of the Policy's [$]12 million cap, that those losses were caused by an Insured Event, here the 2006 E. coli outbreak, and that those losses are covered by the Policy." The court rejected Fresh Express's breach of the implied covenant cause of action and postponed deciding the issue of prejudgment interest.

Fresh Express subsequently filed a motion seeking prejudgment interest "from January 4, 2007," under Civil Code section 3287, subdivision (a) or from January 15, 2008, the date the action was filed, under Civil Code section 3287, subdivision (b).

The court subsequently issued a lengthy statement of decision making numerous findings. The court again found that Fresh Express's QRT (quick response team) "assembled immediately upon learning of the outbreak" and

---

[16] Fresh Express recovered faster than its competitors after the E. coli outbreak.

"determined" that Fresh Express "had violated its own food safety policies and protocols in acquiring and processing raw product used in its bagged fresh spinach products. Because of these errors, the QRT found reasonable cause to believe that the consumption of Fresh Express spinach products had led or would lead to illness or death." The court found that Fresh Express had made "errors within the meaning of the Policy." These errors were "(1) spot purchasing spinach from Seco Packing, without conducting the required pre-harvest audit, and then manufacturing, processing, preparing, assembling, blending, and mixing that spinach with other, properly inspected spinach at its processing plant, thereby creating an unacceptable risk of cross-contamination; and (2) spot-purchasing spinach from Lot 4 at Braga Eade Ranch, a lot that had been specifically prohibited by Fresh Express food safety auditor Gary Mittel," and allowing this spinach to be "mixed and blended" with spinach from other sources at Fresh Express's "processing facilities" thereby "allowing possible cross-contamination." The court found that the Fresh Express's QRT had identified the Seco purchases as "serious errors" within a day after the FDA advisory. The trial court concluded that the policy "does not require a recall for Accidental Contamination coverage to be triggered."[17]

The court rejected Beazley's affirmative defense that Fresh Express had not provided adequate notice to Beazley of the nature of its claim because it had not provided a "full description of the 'insured event.' " The court found: "The 'insured event' is not an 'error.' " "[T]he 'insured event' here was the spinach *E. coli* crisis . . . ." The court also found that, in any event, Beazley was not prejudiced by any delay in notifying it of the nature of the "insured event." After addressing liability and affirmative defenses, the statement of decision addressed damages. The court found that Fresh Express's damages were "directly caused by an Insured Event, here the 2006 *E. coli* outbreak . . . ."

Notwithstanding its express finding that "the ultimate cause of Fresh Express' losses was the *E. coli* outbreak itself," the trial court alternatively found that, "even under [Beazley's] interpretation" of the policy, Fresh Express's "expenses and losses would be covered" because (1) Fresh Express's "errors prevented Fresh Express from seeking a full exemption from the FDA's Advisory against eating all bagged spinach," and (2) Fresh Express's "errors were particularly serious and would have required a recall but for the FDA Advisory."

---

[17] The court found: "[A] formal recall would have served no purpose because all spinach had already been removed from the shelves of grocers" due to the FDA advisory. In the court's view, Fresh Express's failure to initiate a recall under these circumstances was consistent with its duty to mitigate its damages, as a recall would have further damaged its "reputation and brand."

On November 17, 2009, the court entered judgment for Fresh Express. Fresh Express recovered damages of $12 million. The court found that Fresh Express's entitlement to prejudgment interest did not begin until the court's August 2009 ruling. Beazley timely filed a notice of appeal. Fresh Express timely filed a notice of cross-appeal.

## III. Discussion

### A. Interpretation of Insurance Policy

Beazley's primary contention on appeal is that the trial court misinterpreted the meaning of the policy when it concluded that the "E. coli outbreak" was an "Insured Event" under the policy's coverage for "Accidental Contamination." Beazley does not challenge the trial court's factual finding that an "Insured Event" of "Accidental Contamination" *occurred*. It contends that the trial court erred because all of the losses established by Fresh Express at trial were attributed to the "E. coli outbreak," an event that *was not* covered by the policy, rather than to "Accidental Contamination," the only event that *was* covered by the policy.

### 1. Standard of Review

■ We apply well-settled rules to the trial court's interpretation of the policy. "Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. [Citations.] [¶] On the other hand, 'any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates.' [Citations.] The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy. [Citations.] Its effect differs, depending on whether the language to be construed is found in a clause providing coverage or in one limiting coverage. 'Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured [citations], exclusionary clauses are interpreted narrowly against the insurer. [Citations.]' " (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807–808 [180 Cal.Rptr. 628, 640 P.2d 764].)

■ "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d

920].) "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) "[A] finding of ambiguity in policy language cannot be based on an unreasonable misunderstanding on the part of the insured." (*Producers Dairy Delivery Co. v. Sentry Ins. Co., supra*, 41 Cal.3d at p. 913.)

■ "Whether language in a contract is ambiguous is a question of law." (*Producers Dairy Delivery Co. v. Sentry Ins. Co., supra*, 41 Cal.3d at p. 912.) The nature of a policyholder's "reasonable expectation of coverage" is also a question of law. (*Oliver Machinery Co. v. United States Fid. & Guar. Co.* (1986) 187 Cal.App.3d 1510, 1518 [232 Cal.Rptr. 691].)

## 2. Analysis

Beazley contends that, under the clear and unambiguous language of the policy, "Insured Event" was equated with "Accidental Contamination," and "Accidental Contamination" was narrowly defined to refer to actual or potential contamination by an "[e]rror" committed by Fresh Express. Since "the E. coli outbreak" was not attributable to an error by Fresh Express, Beazley argues, the "outbreak" could not qualify as an "Insured Event" under the policy.

Fresh Express, on the other hand, claims that the policy did not require that the "Insured Event" be the result of any "[e]rror" by Fresh Express. Fresh Express claims that all the policy required was that Fresh Express's "errors were sufficiently serious to link it to the *E. coli* outbreak." Fresh Express maintains that "the 'Insured Event' is the *product recall or withdrawal* that follows from the recognition there is 'reasonable cause to believe' that the insured's products have caused or will cause harm if not removed from the market." (Italics added.) In Fresh Express's view, "[n]othing in the Policy requires that the products actually cause the outbreak."

The policy language unambiguously rebuts Fresh Express's position. The policy provides that Beazley will "reimburse [Fresh Express] for *losses* as specified in this Policy *arising out of Insured Events* . . . incurred by [Fresh Express] . . . *only where such losses arise because of* . . . [¶] . . . [¶] . . . *Accidental Contamination [or another specified Insured Event]*." (Boldface & italics added.) Therefore, the only insured losses are those that arise from, and because of, an "Insured Event."[18] Only three "Insured Events" are

---

[18] It is well accepted that " 'arising out of' " is used in insurance policies to denote a "minimal causal connection" (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th

covered by the policy, and the only "Insured Event" at issue here is "Accidental Contamination."[19] "Accidental Contamination" is defined by the policy as "[e]rror by [Fresh Express] in the manufacture, production, processing, preparation, [or] assembly . . . of any Insured Products . . . which causes [Fresh Express] to have reasonable cause to believe that the use or consumption of such Insured Products has led or would lead to" bodily injury.

Since the policy equates "Insured Event" and "Accidental Contamination," the policy restricts recoverable losses to those "arising out of" and "because of" an *"Error by [Fresh Express]* . . . which causes [Fresh Express] to have reasonable cause to believe" that use of the product will cause bodily injury. (Italics added.) The policy also explicitly excludes from recoverable losses "[a]ny expenses incurred by [Fresh Express] or any loss of Gross Profit for any reason other than *as a direct result of an Insured Event.*" Hence, the only recoverable losses are those which are the "direct result" of an "[e]rror by [Fresh Express]."

■ The trial court's finding that the "Insured Event" was "the E. coli outbreak" is entirely inconsistent with the plain language of the policy. The only type of "Insured Event" covered by the policy that was at issue here was "Accidental Contamination." In order for the trial court's finding to be true, it would have to be the case that "the E. coli outbreak" *was* "Accidental Contamination." However, "Accidental Contamination" is *defined* by the policy as an "[e]rror by [Fresh Express]" that reasonably caused Fresh Express to believe that the use or consumption of its products would lead to bodily injury. While "the E. coli outbreak" itself may have given Fresh Express cause to believe that its products were contaminated, "the E. coli outbreak" was not an "[e]rror by [Fresh Express]" so it could not qualify as "Accidental Contamination" and thereby an "Insured Event" under the policy. Similarly, while the trial court found that Fresh Express's·losses were the direct result of "the E. coli outbreak" and therefore recoverable under the policy, the policy restricted recoverable losses to those that were the direct result of an "[e]rror by [Fresh Express]."

We conclude that the policy's plain language refutes the trial court's finding that "the E. coli outbreak" was an "Insured Event" under the policy.

### B. Sufficiency of the Evidence

The trial court's statement of decision was largely devoted to Fresh Express's interpretation of the policy under which "the E. coli outbreak" was

---

321, 328 [81 Cal.Rptr.2d 557]) and generally means that one event has its origin in the other. (*Vitton Construction Co., Inc. v. Pacific Ins. Co.* (2003) 110 Cal.App.4th 762, 767 [2 Cal.Rptr.3d 1].)

[19] "Insured Event" is defined as "Malicious Contamination, Products Extortion or Accidental Contamination."

an "Insured Event." The court found that all of Fresh Express's losses were recoverable because they were the direct result of "the E. coli outbreak" and "the ultimate cause of Fresh Express' losses was the *E. coli* outbreak itself." However, the court's statement of decision also devoted four paragraphs to the trial court's alternative finding that Fresh Express's "expenses and losses would be covered" "even under [Beazley's] interpretation" of the policy. The trial court reasoned that coverage was available under Beazley's interpretation of the policy because (1) Fresh Express's "errors prevented Fresh Express from seeking a full exemption from the FDA's Advisory against eating all bagged spinach," and (2) Fresh Express's "errors were particularly serious and would have required a recall but for the FDA Advisory." The court concluded: "That the FDA Advisory pre-empted the need for an official recall does not change the fact that Fresh Express' errors would have necessitated a recall and withdrawal of Fresh Express' spinach from the market." The court made no specific finding that Fresh Express's losses were the direct result of its errors or of its failure to obtain an exemption from the FDA advisory.

Fresh Express asks us to uphold the trial court's judgment on the basis of the court's alternative finding. Beazley contends that the trial court's findings cannot support coverage because substantial evidence does not support (1) the court's finding that Fresh Express would have been able to obtain an exemption from the FDA advisory in the absence of its errors, (2) a conclusion that Fresh Express's losses resulted from its errors rather than from "the E. coli outbreak," and (3) a finding that Fresh Express would have suffered the claimed losses if it had initiated a recall or withdrawal.

We review the validity of the trial court's alternative finding for substantial evidence. " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; accord, *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253].) "Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value. [Citation.] However, '[s]ubstantial evidence . . . is not synonymous with "any" evidence.' [Citation.] Instead, the evidence must be ' "substantial" proof of the essentials which the law requires.' " (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 [109 Cal.Rptr.2d 583].)

As we have already discussed, the insurance policy issued by Beazley to Fresh Express restricted recoverable losses to those "arising out of" and

"because of" an *Error by [Fresh Express]* . . . which causes [Fresh Express] to have reasonable cause to believe" that use of the product will cause bodily injury. (Italics added.) The policy also explicitly excluded from recoverable losses "[a]ny expenses incurred by [Fresh Express] or any loss of Gross Profit for any reason other than *as a direct result of an Insured Event*." Hence, the only recoverable losses were those which were the "direct result" of an "[e]rror by [Fresh Express]."

Unquestionably, there was substantial evidence that Fresh Express had made "[e]rror[s]" within the meaning of the policy. Fresh Express presented substantial evidence that its purchase of Braga Farms/Eade Ranch lot 4 spinach and Seco Packing/Bloomfield Farms spinach in violation of its policies gave it reasonable cause to believe that some of its spinach was contaminated and therefore would cause bodily injury if consumed. However, there was no evidence that these errors had any connection to the E. coli outbreak or to the FDA advisory. None of Fresh Express's spinach associated with its errors was ever linked to the E. coli outbreak, and the FDA had no knowledge of Fresh Express's errors when it issued its advisory, which was issued for independent reasons. Hence, neither the E. coli outbreak nor the FDA advisory *arose from* Fresh Express's errors. The sole cause of the E. coli outbreak and the FDA advisory was NSF's contaminated spinach, not any errors by Fresh Express.

Fresh Express did not present substantial evidence of a nexus between Fresh Express's errors and the E. coli outbreak or the FDA's issuance of its advisory. Hence, Fresh Express could recover losses under the policy only if it could establish that these losses were attributable to its errors. Fresh Express made no attempt to pursue such a course at trial. No evidence was presented linking its losses to its errors. Fresh Express's damages witnesses testified unequivocally that Fresh Express's damages were "attributed to the E. coli outbreak" or the FDA advisory, which they equated and "assum[ed]" constituted the "Insured Event." Beazley asked all of Fresh Express's damages witnesses whether they attributed any of Fresh Express's damages to Fresh Express's errors, and they replied that they had not made any attempt to do so. They did not attribute *any* of the losses to "errors" by Fresh Express or to any event other than the E. coli outbreak/FDA advisory. Thus, the trial court had before it no evidence linking Fresh Express's losses to an event covered by the policy. Consequently, the trial court's finding that Fresh Express's losses were recoverable even under Beazley's correct interpretation of the insurance policy cannot be upheld.

Fresh Express's attempts to rebut this conclusion are unavailing. It argues that it presented substantial evidence that its errors "precluded" it from "seeking a full exemption from the FDA [advisory]" based on its GAP's. Yet

Fresh Express presented no evidence to support a finding that the impact of the errors on its actual or hypothetical request for an exemption led to its losses. Obviously, the E. coli outbreak and the FDA advisory *preceded* Fresh Express's opportunity to request an exemption from the FDA advisory. Within a few hours of the FDA's advisory, Fresh Express, which had not yet determined the sources of its spinach, stopped harvesting, processing, and distributing spinach products. Fresh Express admitted that this decision was based on the FDA advisory and the resulting loss of public confidence in spinach products, not on Fresh Express's errors. Bagged spinach had disappeared from grocery stores throughout the United States within 24 hours, so there was simply no market for spinach. In addition, even though the FDA advisory applied only to spinach, there had been an immediate "big consumption drop" in all leafy greens, not just spinach.

In this context, the evidence cannot support a finding that the losses suffered by Fresh Express would not have occurred if only Fresh Express had been able to obtain an exemption from the FDA's advisory as soon as it confirmed its spinach sources. Any exemption necessarily would have been obtained after Fresh Express had stopped harvesting, processing, and distributing spinach products, after all spinach had disappeared from grocery store shelves throughout the country, and after the public had lost confidence in not only spinach but all leafy greens. All of these events occurred *before* Fresh Express obtained information about the sources of its spinach. Had Fresh Express made no errors, it still could not have sought an exemption until it could confirm the sources of its spinach. Fresh Express produced no evidence that an exemption of its spinach from the FDA advisory at that point would have precluded the losses that it sought to recover at trial. The FDA's complete lifting of its advisory was a more momentous event than an exemption would have been as it eliminated the cloud that hung over bagged spinach generally. Nevertheless, Fresh Express continued thereafter to suffer losses both from reduced demand for spinach and from reduced demand for other leafy greens. On these undisputed facts, substantial evidence does not support a finding that an earlier removal of Fresh Express from the FDA advisory would have eliminated Fresh Express's losses. It follows that those losses cannot be attributed to Fresh Express's inability to obtain an earlier exemption from the FDA advisory.[20]

Fresh Express also asserts that it presented substantial evidence that its errors would have required it to conduct a recall if the FDA had not already issued its advisory. This point is essentially irrelevant because no evidence

---

[20] We assume for the sake of argument that there was substantial evidence that Fresh Express would have been able to obtain an exemption from the FDA advisory if only it had not made errors. The fact that the Kentucky cases appeared to be linked to Fresh Express spinach that had nothing to do with Fresh Express's errors strongly indicates otherwise.

presented at trial supported a finding that a Fresh Express recall of the spinach affected by its errors would have produced any of the losses that Fresh Express suffered as a result of the "E. coli outbreak" and the FDA advisory, that it sought to recover at trial, and that the trial court awarded to it. Any Fresh Express recall of the spinach affected by its errors would have occurred *after* the FDA advisory and *after* all of the spinach associated with Fresh Express's errors had already been removed from stores by retailers. This is true because Fresh Express did not discover its errors until after the FDA advisory. No witness testified that a post-FDA-advisory recall of the Fresh Express spinach linked to Fresh Express's errors would have produced the same losses that were produced by the E. coli outbreak and the FDA advisory. In the absence of such evidence, the requisite nexus is lacking.

On this record, we cannot uphold the trial court's judgment based on the alternative theory.

## IV. Disposition

The judgment is reversed, and the matter is remanded with directions to enter a judgment of dismissal. Fresh Express's cross-appeal is dismissed as moot. Beazley shall recover its appellate costs.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.

A petition for a rehearing was denied October 4, 2011, and the opinion was modified to read as printed above. The petition of appellant Fresh Express Incorporated for review by the Supreme Court was denied January 11, 2012, S197248.