*1180 Opinion
CODRINGTON, J.
I
INTRODUCTION
Plaintiff and appellant Windsor Food Quality Company, Ltd. (Windsor), manufactured Jose Ole frozen food products, using ground beef supplied by Westland/Hallmarlc Meat Company (Westland). In 2008, after a voluntary United States Department of Agriculture (USDA) recall of Westland beef, Windsor made a claim under its contamination products insurance policy,[1] issued by defendants and respondents — QBE Insurance (Europe) Limited and the Underwriters of Lloyds of London (Lloyds). After Lloyds denied coverage on various grounds, Windsor sued for breach of contract and bad faith. The trial court granted Lloyds’s summary judgment motion, finding no triable issues of material fact and no coverage.
Windsor appeals, arguing that it is entitled to insurance coverage based on a reasonable interpretation of Lloyds’s policy. Windsor also contends that whether Lloyds acted in bad faith remains a triable issue of fact, which only a jury can resolve.
Lloyds responds that Westland’s ground beef was not an “Insured Product” under the policy and — even if the ground beef was an insured product — it was not “tampered with” or the tampering was not “malicious.” Finally, Lloyds contends that, even if it wrongly denied coverage, it acted reasonably as a matter of law, and is not subject to bad faith liability.
As the dissent recognizes and articulates, this dispute ultimately concerns whether the Lloyds policy covers ingredients obtained from a supplier and used in Windsor’s products. We conclude Windsor cannot claim coverage for the recall of Westland’s ground beef. We agree with the trial court there are no disputed material facts and no bad faith by Lloyds. We affirm the judgment.
*1181 II
FACTUAL AND PROCEDURAL BACKGROUND
1. The Complaint
Windsor sued Lloyds for denying its claim for the losses caused by the recall of its products containing Westland’s ground beef. Windsor’s operative complaint asserts three causes of action for the breach of an implied covenant of good faith and fair dealing, breach of contract, and declaratory judgment. Windsor maintains it is entitled to coverage under the insurance provision for “Malicious Product Tampering.” The first amended complaint makes the following allegations.
Windsor is a wholesale producer of beef products and Westland is its supplier. Windsor purchased ground beef from a Westland slaughterhouse in Chino. Westland employees admitted participating in criminal animal abuse.
On January 30, 2008, the USDA suspended Westland as a supplier to federal food and nutrition programs because of an investigation of the prohibited use in human food of “non-ambulatory disabled cattle [(downer cows)] and cattle tissue identified as specified risk materials.” On February 17, 2008, the USDA announced a voluntary class II recall of all Westland products for a two-year period because Westland had used “downer cattle” that may have been contaminated. One possible risk was infection by bovine spongiform encephalopathy (BSE), known as “mad cow” disease, that can cause Creutzfeldt-Jakob disease (CJD), a neurological disease in humans. As described by the USDA, a class II recall involves “a health hazard situation where there is a remote probability of adverse health consequences from the use of the product.” Windsor recalled its products, incorporating Westland beef, and incurred about $3 million dollars in recall costs.
Lloyds issued a $4 million policy for contamination products insurance to Windsor, effective from May 6, 2007, to May 6, 2008, which includes coverage for “Accidental Product Contamination” and “Malicious Product Tampering.” Section 1.2 defines an “Insured Event” as “(a) any actual Accidental Product Contamination; [][] (b) any Malicious Product Tampering; [][] (c) any Product Extortion Demand.” Section 5.7 of the insurance policy defines “Insured Products” as “all products including their ingredients and components once incorporated therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . .” (Italics added.) Section 5.10 provides that “Malicious Product Tampering” means “the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insured[’s] Products whether in conjunction *1182 with a Product Extortion Demand or not so as to give the Insured or consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use.”[2] On July 7, 2008, based on section 5.1, Lloyds denied Windsor’s claim for “Accidental Product Contamination,” which “would lead to or has led to bodily injury, sickness, or disease of any person, animal or livestock physically manifesting itself within 120 days of its consumption or use.” It is not disputed that there was no actual injury to consumers from Westland beef within 120 days.
2. Summary Judgment Motion
The parties identified two sets of material facts in their combined separate statements. We summarize the facts, determining whether any material facts are effectively disputed by Windsor.
The parties concur as to Lloyds’s description of the USDA’s comprehensive testing and recall procedures and Lloyds’s explanations of CJD and BSE, including the declaration of Dr. Richard T. Johnson, a neurologist and an expert on CJD. Dr. Johnson explained the average incubation period for CJD in a human is at least 10 years and “[tjhere is no evidence that manifestation of such illness will occur within a period of 120 days of consumption of BSE contaminated beef products.” There were no reports or evidence of anyone becoming ill from ingesting Windsor’s products.
The USDA class II voluntary recall was based on “ ‘a health hazard situation where there is a remote probability of adverse health consequences.’ ” The USDA stated the recall was about failure to comply with FSIS regulations and “was not about food safety” and “really not a health-related issue.” In particular, the recall was caused by Westland’s failure to initiate USDA inspections of downer cattle. Windsor attempted to dispute these assertions by describing them as Lloyds’s attempt “ ‘publicly [to] downplay the recall’s significance.’ ” Without identifying any evidence, Windsor contends that, if there had not been a health risk, then the USDA would have declared a class III recall, not a class II recall. Windsor submitted additional facts about BSE and CJD, which Lloyds countered were irrelevant, inaccurate, or not disputed.
As fact No. 51, Lloyds asserted, “ ‘[tjhere was no intentional and malicious adulteration of the products of Windsor Foods. [’] ” As evidence, Lloyds cited the testimony of two witnesses — Windsor employees, Michael Cramer and *1183 Manuel Martinez — that they had no information about intentional or malicious contamination or extortion involving Windsor’s products. Windsor responded that Lloyds was not presenting a fact but arguing a legal conclusion. Lloyds objected to the relevance and admissibility of evidence submitted by Windsor to establish that “rogue employees” had contaminated Westland’s ground beef. In a videotape recording, two Westland employees were shown pushing downer cows with a forklift, shocking them with an electric prod, and spraying them with water to get them on their feet. The men were charged with felony animal cruelty.
As fact No. 52, Lloyds asserted that Windsor had been advised by an industry expert that its claim would not be covered under the insurance policy. Lloyds cited e-mail communications exchanged between Cramer, Martinez, Stanley Smith, and an insurance consultant, Robert Garfield. Windsor objected on the grounds of hearsay, relevance, and foundation and argued that Garfield’s opinion “involved the general sentiments of the insurance industry about the legions of claims that affected companies were making.” Finally, Lloyds responded to Windsor’s various arguments — labeled as facts — about denial of coverage under the insurance policy as irrelevant, inaccurate, or not disputed.
3. The Summary Judgment Motion
In its order granting summary judgment to Lloyds, the trial court sustained Windsor’s objections to the evidence Lloyds had submitted about the e-mails in support of fact No. 52. Nevertheless, the trial court found there were no triable issues of any material fact. The court cited the uncontroverted medical evidence by Dr. Johnson that there was no public health risk of CJD or BSE and the court found there was no evidence to establish tampering with an insured product. Additionally, the court found the recalled products were not an “Insured Product” under section 5.7 of the policy and Lloyds had acted reasonably in denying coverage.
Ill
DISCUSSION
1. Standard of Review
Summary judgment was properly granted in this case if there were no triable issues of material fact and Lloyds was entitled to judgment as a matter of law: “The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties’ pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their *1184 dispute. [Citation.]” (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493]; see Code Civ. Proc., § 437c, subd. (c).)
Lloyds was entitled to summary judgment if it established a complete defense to Windsor’s causes of action, or showed that one or more elements of each cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (o); Aguilar v. Atlantic Richfield Co., supra, 25 Cal.4th at p. 849.) Once Lloyds met its initial burden of production, the burden shifted to Windsor to demonstrate a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); Aguilar, at pp. 850-851.)
The trial court bases its determination on the issues as framed by the pleadings and on the evidence submitted by the parties: “In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted, as well as those admitted and uncontested in the pleadings. [Citations.] The court must consider all evidence set forth in the parties’ papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action, thereby entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)” (Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn. (2001) 92 Cal.App.4th 1247, 1261 [112 Cal.Rptr.2d 732].)
On appeal, we conduct a de nova review of the record: “We examine the evidence and independently determine its effect. [Citation.] We must uphold the judgment if it is correct on any ground, regardless of the reasons the trial court gave. [Citation.]” (Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn., supra, 92 Cal.App.4th at p. 1261.)
The same principles apply in the insurance context if the evidence established as a matter of law that Lloyds’s contamination products insurance policy does not provide coverage to Windsor: “ ‘We apply a de nova standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.’ [Citations.] [1] In reviewing de nova a superior court’s summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts.” (Powerine Oil Co., Inc. v. Superior Court (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589].)
*1185 2. Interpretation of Insurance Contract
Having independently reviewed the parties’ combined separate statements, we conclude there is no evidence of material facts in dispute. The uncontradicted evidence establishes that Westland’s ground beef was the subject of a voluntary class II USDA recall because of potential risk from the use of downer cattle not because of contamination or tampering. In any event, there was no contamination or tampering. Windsor participated in the recall but no one suffered any illness or injury. Lloyds rejected Windsor’s claim for recall damages because the contamination products insurance policy did not provide recall coverage.
In view of the undisputed facts, our task is to apply the three-step process for interpretation of an insurance contract to decide whether there is coverage. (AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The ordinary rules of contract interpretation, which apply to Lloyds’s insurance policy, include the fundamental goal of giving effect to the mutual intention of the parties. When clear and explicit contractual language governs, intent is to be inferred solely from the written provisions of the contract if possible. (Powerine Oil Co., Inc. v. Superior Court, supra, 37 Cal.4th at p. 390, citing Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545], and AIU Ins. Co., at pp. 821-822.) As an insurer, Lloyds is entitled to limit its coverage to defined risks and, if it does so in clear language, courts will not impose coverage where none was intended. (National Ins. Underwriters v. Carter (1976) 17 Cal.3d 380, 386 [131 Cal.Rptr. 42, 551 P.2d 362].) Whether a clause is ambiguous and whether Windsor has an objectively reasonable expectation of coverage in light of the insuring language are questions of law. (Schrillo Co. v. Hartford Accident & Indemnity Co. (1986) 181 Cal.App.3d 766, 775-776 [226 Cal.Rptr. 717].)
Under the first-party policy in this case, after Lloyds explained its reason for denying coverage, Windsor had the burden “ ' “to prove that an event is a claim within the scope of the basic coverage.” ’ ” (Central Nat. Ins. Co. v. Superior Court (1992) 2 Cal.App.4th 926, 932 [3 Cal.Rptr.2d 622].) Specifically, Windsor must prove its claim falls within coverage for the “named peril” of section 5.10, Malicious Product Tampering, which means “the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insured[’s] Products ... so as to give the Insured or consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use.” Windsor must also prove that the tampering affected an “Insured Product,” defined by section 5.7 as “all products including their ingredients and components once incorporated therein of the Insured that are *1186 in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . .”[3] (Italics added.)
The parties, of course, disagree about how to interpret Lloyds’s policy. Beginning with the meaning of “Insured Product,” Windsor contends that losses caused by the recall qualify for coverage because, ultimately, Westland’s ground beef was an ingredient incorporated into Windsor’s final product. Lloyds counters that an ingredient is only covered once it has been incorporated into Windsor’s products. To use frozen burritos as an example, Windsor would propose that a frozen burrito made with adulterated ground beef is an insured product. Lloyd would counter that a frozen burrito is only an insured product if it is adulterated during or after its preparation by Windsor. Lloyds disagrees that “Insured Product” includes ingredients used to make Windsor’s products.
A policy provision is considered ambiguous when it is capable of two or more reasonable constructions. (Powerine Oil Co., Inc. v. Superior Court, supra, 37 Cal.4th at p. 390, citing Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619], and Bay Cities Paving & Grading, Inc. v. Lawyers’ Mutual Ins. Co. (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263]; see Fresh Express, Inc. v. Beazley Syndicate 2623/623 at Lloyd’s (2011) 199 Cal.App.4th 1038, 1052-1053 [131 Cal.Rptr.3d 129].) However, “[c]ourts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.” (Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]; see City of Laguna Beach v. Mead Reinsurance Corp. (1990) 226 Cal.App.3d 822, 830 [276 Cal.Rptr. 438].)
We conclude the subject policy is not ambiguous. Unlike the dissent, we hold the policy’s definition of what constitutes an, “Insured Product” clearly does not encompass an ingredient obtained from a supplier, like the ground beef supplied by Westland. Lloyds’s policy provides coverage for “Insured Products” and an “Insured Event.” An insured event involves product contamination or tampering. An “Insured Product” means “all products including their ingredients and components once incorporated therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . .” (Italics added.) In plainer language, Windsor must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process. In order for a frozen burrito to qualify as an insured product, there must have been contamination or tampering during production, manufacture, packaging, or distribution — not because one of its ingredients supplied by a third party was adulterated. (See *1187 Caudill Seed & Warehouse Co. v. Houston Cas. Co. (W.D.Ky. 2011) 835 F.Supp.2d 329, 335-336 [recall of peanut products processed by insured did not trigger accidental product contamination coverage.].)
Furthermore, there is also no evidence of any contamination of or tampering with Westland beef. It is not disputed that Westland employees apparently mistreated animals at the slaughterhouse. However, the record establishes that the reason for the recall was Westland’s failure to notify the USD A about downer cattle and submit to an inspection, not because there had been tampering or contamination. It is therefore undisputed there is no evidence that the recall occurred because Westland employees tampered with or contaminated the ground beef supplied to Windsor.
When adulterated ingredients are supplied by a third party, as may have occurred here, the policy does afford coverage for accidental product contamination under section 5.1. The coverage only applies, however, if some injury occurs within 120 days of consumption of the product. In this case, no injury occurred within 120 days or at all. Therefore, according to the plain language of the policy, no insured event was covered under the policy. (See Fresh Express, Inc. v. Beazley Syndicate 2623/623 at Lloyd’s, supra, 199 Cal.App.4th at p. 1054.)
In the absence of any ambiguity in the insurance policy, we find it unnecessary to seek additional legal definitions or to consult the dictionary for the meaning of commonly understood terms like tampering, adulteration, alteration, or malicious. We also reject Windsor’s unsupported argument that any losses caused from tampering by a third party, which is discovered during the policy period, should be covered. Windsor cites no pertinent authority for this position.
Windsor offered no evidence proving it was entitled to coverage under the policy for accidental contamination or malicious tampering involving an insured product. Consequently, there was no breach of contract or implied covenant and no bad faith. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 36; Jordan v. Allstate Ins. Co. (2007) 148 Cal.App.4th 1062, 1078 [56 Cal.Rptr.3d 312]; Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co. (2001) 90 Cal.App.4th 335, 345-347 [108 Cal.Rptr.2d 776].)
Our conclusions in this case are supported by various federal authorities. In The Limited, Inc. v. Cigna Ins. Co. (E.D.Pa. 2001) 228 F.Supp.2d 574, 580, the district court concluded that a product tampering and accidental contamination insurance policy indicated that “the parties intended to have coverage for only those specific instances of product tampering and accidental contamination, not for product recalls in general . . . .” In Ruiz Food *1188 Products v. Catlin Underwriting U.S., Inc. (E.D.Cal., Sept. 13, 2012, No. 1:1 l-cv-00889-BAM) 2012 WL 4050001, page *6, the district court agreed: “Recalls generally, even if related to a belief that a product has been contaminated, [do] not qualify as a contamination under an accidental contamination policy.” In Hot Stuff Foods, LLC v. Houston Cas. Co., supra, 771 F.3d at pages 1075-1076, the Eighth Circuit recognized that contamination products insurance and recall insurance afford different kinds of coverage: “At least some general commercial liability policies exclude losses incurred because of a recall. [Citation.] The need to recall contaminated or adulterated product is a recognized risk of doing business in the heavily regulated food industry. Thus, the exclusion compels food companies such as Hot Stuff to purchase policies separately insuring against this risk. . . . [¶] . . . [¶] This . . . brings into focus why insurers and food industry insureds would agree to limit Accidental Product Contamination coverage to recall incidents in which consumption of the contaminated or mislabeled product ‘resulted, or may likely result’ in physical symptoms of bodily injury, sickness or disease or death of any person. As other courts to consider this coverage have concluded, this ‘is not a recall insurance policy.’ Ruiz, 2012 WL 4050001, at *10; see The Limited, 228 F.Supp.2d at 580.”
IV
DISPOSITION
The contamination products insurance policy issued by Lloyds did not cover Windsor’s losses caused by the voluntary recall of Westland’s ground beef. We affirm the summary judgment. Lloyds, the prevailing party, shall recover its costs on appeal.
McKinster, Acting P. 1, concurred.

 The Underwriters of Lloyds of London policy is not a recall insurance policy. (Hot Stuff Foods, LLC v. Houston Cas. Co. (8th Cir. 2014) 771 F.3d 1071, 1076.)

 Section 5.13, which is not at issue in this appeal, provides that “Product Extortion Demand” means “any threat or connected series of threats received by the Insured to commit Malicious Product Tampering for the purpose of soliciting money, securities or property.”

 In its reply brief, Windsor incorrectly asserts that the definition of an insured product does not apply to malicious product tampering.