# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2668

_____

Ross Parkhurst, individually and as     *
guardian and next friend of H. P.;     *
Amy Parkhurst, individually and as     *
guardian and next friend of H. P.;     *
H. P., a minor child under the age of     *
eighteen,     *
    *
       Plaintiffs - Appellees,     *
    *   Appeal from the United States
       v.     *   District Court for the
    *   Western District of Arkansas.
Chad Belt,     *
    *
       Defendant - Appellant.     *

_____

Submitted: May 13, 2009
Filed: June 9, 2009

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Ross and Amy Parkhurst, the adoptive father and biological mother of H.P., a minor child, asserted claims as next friend against Chad Belt, H.P.'s biological father, for outrage and battery based on Belt's alleged sexual abuse of H.P. After a jury trial, judgment was entered in favor of the Parkhursts for $250,000 in compensatory

damages and $750,000 in punitive damages.[1]  Belt appeals, arguing that there was insufficient evidence to sustain the judgment and that the district court erred in permitting H.P. to testify by closed circuit television.  We affirm.

## I.

Amy and Belt married in Arkansas in 1993, and H.P. was born in 1994.  When the couple divorced in 2000, Amy was awarded sole custody while Belt was granted visitation rights.  Shortly thereafter Amy relocated to Arizona with H.P. and married Ross Parkhurst.  H.P. first visited Belt in Arkansas for an extended period of time during the summer of 2001 when she was seven.  Since Belt was a student at the time, H.P. spent the majority of her weekdays with her paternal grandmother.  Belt testified that he and H.P. were alone on weekends, however, and that H.P. was not alone with any other adult male.

H.P.'s maternal grandmother Theresa Williams, who lived near Belt, testified that she had received a frantic phone call from H.P. during the summer of 2001, pleading "help me, God, help me . . . please help me, come get me." Williams went to Belt's home to retrieve H.P., but the doors were locked and the blinds were drawn. She was unable to gain entrance to the home.  At the end of summer, Belt delivered H.P. to Williams who was going to drive her granddaughter back to Arizona. Williams testified that H.P. ran into a closet in her house, began crying, and refused to say goodbye to Belt.  When H.P. rejoined her mother in Arizona, she displayed severe behavioral difficulties.  Amy Parkhurst testified that H.P. was a "completely, completely different child" upon returning from Arkansas.  Because she was concerned about H.P., Amy Parkhurst took her to a family physician, Dr. Edith Bailey, for a "well check up."  Dr. Bailey testified to taking a "quick peek" at H.P.'s genitals

---

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas, presiding.

with her "naked eye." Although she did not note any abnormalities indicating child abuse, Dr. Bailey testified that her limited examination would not necessarily have detected evidence of sexual assault.

When Belt arrived in Arizona the following summer to take H.P. back to Arkansas, she suffered a nervous breakdown and threatened to run away if she were forced to go. Belt claims that H.P.'s refusal to return to Arkansas was related to a recent forest fire in the vicinity of her Arizona home, and he filed a contempt motion against Amy Parkhurst for violation of the custody agreement. Although Belt alleged at trial that the Parkhursts pressured H.P. into manufacturing allegations of abuse in order to dissuade him from pursuing the contempt proceedings, the record indicates that Belt offered to settle them for $1500 before the allegations of abuse first surfaced. H.P. returned to Arkansas for a visit during the winter of 2002. In advance of the trip she wrote to Santa Claus: "Dear Santa . . . . I want to talk to you about having to go to my other dad's house back in Fort Smith. Please don't make me go back this year. You are magic, remember. . . . Please Santa, please, just this one Christmas, please, Santa." H.P. nevertheless spent the holiday in Arkansas with Belt, apparently without event.

H.P. returned to Arkansas in the summer of 2003. H.P. and her mother spoke frequently while she was at Belt's. Amy Parkhurst testified that during these calls H.P. "was a mess, just crying, not doing well at all." As a result she began to record her conversations with H.P. On July 21, 2003, H.P. telephoned her mother and informed her that she had injured her "private part" in a diving board accident and was bleeding vaginally. H.P. told her mother that Belt had not taken her to a doctor and asked her mother not to tell Belt that she had mentioned the bleeding. She also asked her mother "not to tell the judge" about the "situation" because it would be "embarrassing." A recording of this call was entered into evidence at trial and played for the jury. Amy Parkhurst traveled to Arkansas on July 24 to investigate the nature of H.P.'s injuries. Upon her arrival, H.P. informed her that both her "bottom" and her vagina were

injured.  Amy Parkhurst examined H.P. but saw no external bruising or scraping.  She then examined H.P.'s internal genitalia and testified that "it just looked like she had had a baby . . . .   She was cut open, ripped open."

Amy Parkhurst had H.P. examined on July 24 by Dr. Myra Gregory, a family practitioner.  Dr. Gregory testified that H.P. "had some vaginal discharge and also a tear in her vaginal area."  She also testified that H.P.'s injuries were consistent with sexual abuse, inconsistent with a diving board injury, and that H.P. equivocated about their cause.  Dr. Gregory then referred H.P. for a sexual abuse examination.  On July 25 H.P. was examined by Barbara Durham, a nurse practitioner experienced in pediatric sexual abuse.  Durham noted that H.P. had internal genital injuries, including a laceration at the base of the vaginal vault and that the "hymen d[id] not appear intact."  Durham testified that a diving board was inconsistent with H.P.'s injuries because she lacked external bruising, abrasions, or other indicia of external contact with a diving board.  As Durham explained, "when I looked at her story, a corner of a [diving] board found its way deep inside her vaginal vault past her hips, past her thighs, past her symphysis pubis, it did not match."[2]  Durham also noted that H.P. had difficulty disclosing the cause of her injuries, stating that H.P. was "vague in [describing] how this happened . . . ."  Durham concluded at the time of the examination that sexual abuse was a possibility.

On July 28 H.P. was examined at the Children's Safety Center (CSC) by Charla Jamerson, a forensic nurse who specialized in sexual assault examinations.  Jamerson noted in her records that H.P. "stated that her father cusses at me and says the F word

---

[2]At trial, Brent Turvey, a forensic expert specializing in wound pattern analysis, discussed the defense theory.  He concluded that H.P. could not have been injured on the diving board because "in accordance with the laws of gravity, one of the legs or both legs are going to show some injury to the inner thigh . . . we don't have that."  Turvey also explained that a "diving board is not some narrow device that goes into the interior genitals and causes an injury on the inside."

-4-

to me" and that "out of everybody in her life she felt the most afraid of her dad." Jamerson conducted an examination with a colposcope, an intragenital magnifying instrument. The examination was recorded and played back for the jury at trial while Jamerson narrated. She indicated areas of vaginal trauma, hymenal thinning, and anal scarring, and testified that such injuries were consistent with "[i]ntercourse with blunt force trauma" to the "vaginal area, the posterior fourchette and to the anus." Jamerson also testified to a reasonable degree of medical certainty that H.P. had been vaginally and anally penetrated.

After the CSC examination, H.P. and her mother returned to Washington state, where the Parkhursts had recently relocated. In Washington H.P.'s emotional condition deteriorated and she was prone to constant "meltdowns." H.P. composed a letter in which she stated, "Mom, I'm so sorry. I feel like I could kill myself now. I hate myself." Shortly thereafter, H.P. began seeing Patty Kellogg, a psychologist. H.P. made it clear to Kellogg that she never wanted to return to Belt in Arkansas. As a therapeutic exercise, Kellogg asked H.P. to compose titles to books she would like to write. They included "If we don't stop him, he will do this to his other kid Lauren;" "I never want to go back there;" "How bad I feel;" "You should love kids not cuss them;" "No control of his self;" and "Treat kids the way they should be treated."

Several weeks after returning to Washington, the Parkhursts received notification that Belt had spontaneously offered to relinquish his parental rights to H.P. if the Parkhursts would sign a statement that they were not accusing him of molesting H.P. The Parkhursts executed the requested document and Belt consented to the termination of his parental rights. Shortly thereafter Ross Parkhurst began proceedings to adopt H.P., and H.P. sought and received assurance that she would not have to visit Belt in the future.

Several days after the adoption ceremony H.P. admitted to her grandmother that Belt "hurt me . . . down there" by "put[ting] his privates in my privates." H.P.

subsequently disclosed the assault to Kellogg and to Dr. Maureen Adair, a board certified psychiatrist who was also treating her. H.P.'s treatment with Dr. Adair included art therapy, and she testified that H.P. drew distorted figures, always with a penis, and that such a depiction is "very abnormal" for a child her age.

The Parkhursts filed a complaint against Belt on June 27, 2007, alleging that Belt sexually assaulted H.P. Prior to trial they moved for a protective order to allow H.P. to testify by live two way closed circuit television rather than in open court. Belt opposed the motion. The Parkhursts submitted affidavits from both Kellogg and Dr. Adair indicating that H.P. suffered from post traumatic stress disorder and would suffer severe psychological and emotional trauma if forced to testify in Belt's presence. H.P.'s therapists also opined that the quality of her testimony would be greatly improved if she were permitted to testify outside of Belt's presence.

The motion for protective order was addressed at a pretrial conference on June 16, 2008. Belt offered to remain outside the courtroom during H.P.'s testimony, but the district court expressed concern that H.P. would still be "emotionally overwrought" and unable to testify in open court. Acknowledging the need to balance H.P.'s welfare with Belt's rights of cross examination and the jury's ability to evaluate her credibility and demeanor, the district court met with H.P. in private to determine whether she would be allowed to testify by closed circuit television. After the meeting the district court stated,

> [H.P.]'s a delightful young woman, articulate and bright and very
> emotional, and I understand, about the events and coming to court . . . .
> I do intend to let her testify by video if she wants. She cried a couple of
> times and was very emotional. It's traumatic just being in court.

Trial began on June 17 and H.P. testified by live two way closed circuit television. Before she took the stand the district court made a record of its reasons for allowing her to testify outside the courtroom, explaining "I was convinced after

talking with her and discussing with her and having her break down on a couple of occasions, that it would not be in her best interests, it would be too traumatic to have her testify in the courtroom." H.P.'s testimony on direct examination included the following evidence:

> **Q:** What do you understand this case to be about?
> **A:** I understand this case to be about him hurting me.
> **Q:** Who is him, [H.P.]?
> **A:** Chad.
> **Q:** And what do you mean by hurt?
> **A:** Rape.
> **Q:** What do you understand rape to mean?
> **A:** Him using his private parts to hurt mine.
> **Q:** [H.P.], how old were you when you were raped?
> **A:** Seven to nine.
> **\*\*\***
> **Q:** Do you remember, do you remember the first time that you were raped when you were seven?
> **A:** Kind of, yeah.
> **\*\*\***
> **Q:** You testified before, [H.P.] that you were raped again that summer in 2003 when you were nine, is that correct?
> **A:** Yes.
> **Q:** Can you tell me where on your body you were raped?
> **A:** My front and my back.
> **Q:** Thank you. [H.P.], what do you recall, if anything, about a fall on a diving board?
> **A:** I was told to.
> **Q:** Who told you to?
> **A:** Chad.

Belt's evidence included: (1) testimony by Belt that "[I] never digitally, never, never anything, not only with her, with any child. I'm not a molester. I'm not a rapist . . . I never touched her in an inappropriate way, nor any other kid;" (2) testimony by Dr. John McClanahan, an obstetrician-gynecologist, who had reviewed H.P.'s medical

records. McClanahan testified that H.P.'s injuries were consistent with both a straddle type injury and sexual assault. He could not, however, testify to a degree of medical certainty that the diving board caused H.P.'s injuries. Rather, he stated that it was a "possibility;" (3) testimony by Belt's mother and wife indicating that H.P. was a "happy" and "normal" child during her summer visits to Arkansas; (4) candid photographs of H.P. introduced to corroborate their accounts; (5) testimony from Belt's wife and neighbor establishing that H.P. had fallen off the diving board (each recalled the fall and its aftermath somewhat differently).

After deliberations, the jury found that Belt was liable for outrage and battery and awarded H.P. $250,000 in compensatory damages and $750,000 in punitive damages. Judgment was entered on June 24, 2008. Belt appeals, arguing insufficient evidence and error in permitting H.P. to testify by closed circuit television.

## II.

When reviewing the sufficiency of the evidence to support a jury verdict in a diversity case, we generally apply the same standard that is used by the state in which the district court sits. Nat'l Am. Ins. Co. v. Hogan, 173 F.3d 1097, 1103 (8th Cir. 1999). Under Arkansas law, "the evidence is viewed in a light most favorable to the appelle [and] the jury's findings will be upheld if there is any substantial evidence to support it." J.E. Medlock v. R.L. Burden, 900 S.W.2d 552, 555 (Ark. 1995). Evidence is substantial unless "there is no reasonable probability in favor of appellee's version." Love v. H.F. Const. Co., Inc., 552 S.W.2d 15, 17 (Ark. 1977). Our standard of review in non diversity matters is not meaningfully different. See, e.g., Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1009 (8th Cir. 2008) ("A jury verdict is entitled to extreme deference and we will not set it aside unless no reasonable jury could have reached the same verdict based on the evidence submitted.") (citation omitted), cert. denied, 129 S. Ct. 1000 (2009).

During the course of a four day trial the Parkhursts introduced extensive testimonial and documentary evidence. Testimony included: (1) evidence regarding a dramatic change in H.P.'s behavior after her 2001 visit to Arkansas; (2) evidence of H.P.'s extreme anxiety regarding future visits to Arkansas; (3) evidence from three medical professionals who had treated H.P. and concluded that her injuries were inconsistent with a diving board accident but consistent with sexual assault; (4) evidence from a forensic expert who concluded that a diving board could not have caused H.P.'s injuries; (5) evidence from H.P.'s psychologist that the girl had told her that her father had raped her; (6) evidence from H.P.'s psychiatrist that H.P. had admitted that her father had raped her; (7) evidence from H.P.'s maternal grandmother that H.P. identified Belt as the abuser; (8) evidence from H.P. identifying Belt as the abuser; and (9) evidence from Belt that he had been alone with H.P. during the summers of 2001 and 2003 and that no other adult male had. Documentary evidence included: (1) medical records indicating that H.P. had been sexually abused and (2) audio recordings depicting H.P.'s mental state.

Belt did not introduce contrary evidence of sufficient force to indicate that there is no reasonable probability in favor of the Parkhursts' view of the evidence. That Belt denied raping H.P., presented expert testimony that a diving board conceivably could have caused her injuries, and presented eyewitness testimony regarding the alleged accident is immaterial. Our review of a jury verdict does not include an assessment of the credibility of witnesses, and it is improper for an appellate court to second guess a jury's credibility determinations. See United States v. McCarthy, 97 F.3d 1562, 1579 (8th Cir. 1996).

Belt also argues that the district court erred in permitting H.P. to testify by live two way closed circuit television rather than in open court. "Rulings on admissibility of evidence will not be reversed absent a clear and prejudicial abuse of discretion." First Sec. Bank v. Union Pac. R.R. Co., 152 F.3d 877, 879 (8th Cir. 1998). Moreover, a district court is afforded wide latitude in determining the manner in which evidence

is to be presented.  See Fed. R. Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . protect witnesses from harassment or undue embarrassment.").

The Federal Rules of Civil Procedure make express provision for testimony by closed circuit television.  See Fed R. Civ. P. 43(a) ("For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.").  Belt argues, however, that the district court abused its discretion by failing to establish whether H.P. was a competent witness.  Although the competency of a witness may be presumed in the usual federal case, we evaluate competency in accordance with state law when it supplies the rule of decision.  See Fed. R. Evid. 601.  Under Arkansas law competency is also presumed, and a court does not abuse its discretion in allowing a witness to testify as long as "the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts." Modlin v. State, 110 S.W.3d 727, 729 (Ark. 2003).

The district court met privately with H.P. prior to deciding whether to permit her to testify by closed circuit television and found her to be "articulate and bright." The district court discussed with H.P. "in great detail the importance of telling the truth" and explained to counsel that "she assured me and I am convinced and finding that she knows right from wrong and knows how important it is to tell the truth, and, therefore, knows the meaning and the value of an oath . . . ."  Because the district court found H.P. intelligent and aware of her obligation to tell the truth Belt's competency objection is without merit.

Relying on Maryland v. Craig, 497 U.S. 836 (1990), a criminal case, Belt also argues that the district court erred in not issuing specific findings regarding the trauma H.P. would suffer if required to testify in the presence of Belt.  Before allowing testimony by closed circuit television in a criminal case the district court should

-10-

determine whether (1) the procedure is "necessary to protect the welfare" of a child witness; (2) the child witness "would be traumatized, not by the courtroom generally, but by the presence of the defendant;" and (3) "the emotional distress suffered by the child witness" would be more than de minimis. United States v. Turning Bear, 357 F.3d 730, 736 (8th Cir. 2004) (quotation omitted); see also 18 U.S.C. § 3509(b)(1)(B).

Belt's effort to impose in a civil case the requirements of the Sixth Amendment, where a defendant enjoys the protection of the Confrontation Clause, is inapposite. See Austin v. United States, 509 U.S. 602, 608 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions.") (quotation omitted). The Federal Rules of Civil Procedure control here and Rule 43 plainly permits a district court "[f]or good cause in compelling circumstances and with appropriate safeguards" to permit a child to testify by closed circuit television. Belt's offer to leave the courtroom prior to H.P.'s testimony is only one factor that the district court could consider in making its decision.

The district court followed Rule 43 by examining H.P. and determining that compelling circumstances justified her testimony by closed circuit television. As the court explained, "I was convinced after talking with her and discussing with her and having her break down on a couple of occasions that it would not be in her best interests, it would be too traumatic to have her testify in the courtroom." The need to protect the welfare of an abused child qualifies as a compelling circumstance. Cf. United States v. Rouse, 111 F.3d 561, 568 (8th Cir. 1997) (defendant's right to confront witness "is not absolute and must accommodate the State's compelling interest in the protection of minor victims of sex crimes from further trauma and embarrassment") (quotation omitted). The district court also ensured that appropriate safeguards were instituted. Indeed, the procedure followed at trial was nearly identical to that allowed by federal criminal statute in proceedings involving an offense against a child. See 18 U.S.C. § 3509(b)(1)(D). Here, the jury could listen to H.P. and observe her demeanor, Belt's attorney was able to cross examine H.P., and

-11-

the transmission was instantaneous.  Moreover, even if it had been error to make use of this technology, any error would have been harmless given the overwhelming evidence presented at trial.  <u>See</u> Fed. R. Civ. P. 61; <u>see also</u> <u>Hall v. Arthur</u>, 141 F.3d 844, 849 (8th Cir. 1998).  Had H.P. been unable to testify, the disclosures she made to her grandmother, mother, counselor, and psychiatrist would have been sufficient to establish Belt's liability.

For the foregoing reasons, the judgment of the district court is affirmed.

_____