# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3838

_____

Wesley Patterson

*Plaintiff - Appellee*

v.

Mutual of Omaha Insurance Company, a Nebraska Corporation

*Defendant - Appellant*

John Doe, a Corporation

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 21, 2013
Filed: February 28, 2014

_____

Before WOLLMAN, COLLOTON, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Wesley Patterson, a student cheerleader at Prairie View A&M University (Prairie View), was paralyzed while practicing a tumbling maneuver during

gymnastics class. Patterson sued Mutual of Omaha Insurance Company (Mutual), seeking coverage under the insurance policy that Mutual had issued to Prairie View as a member of the NCAA. Mutual's policy covers student cheerleaders who are injured during cheerleading practice sessions. The district court[1] denied Mutual's motion for summary judgment and granted Patterson's motion for summary judgment after concluding that the term "practice session" in Mutual's policy included the gymnastics class Patterson was attending when he was injured. We affirm.

I.

It may surprise some to learn that cheerleading is, by some measures, the second most dangerous college sport in the country. Cheerleading trails only football in terms of the total dollar value of catastrophic injury insurance claims submitted to the NCAA's insurers. See Bill Pennington, As Cheerleaders Soar Higher, So Does the Danger, N.Y. Times, Mar. 31, 2007, at A1. Much of this danger is attributable to the incorporation of acrobatic and gymnastic moves into cheerleading routines. Cheerleaders are charged with, *inter alia*, being launched high into the air, performing a series of flips and twists, and landing gracefully back into the arms of their teammates, all without pads.

Patterson joined the Prairie View cheerleading team in the fall of 2007 at the behest of the team's coach, Jim Price. As a cheerleader, Patterson was required to attend cheerleading practice from 5:30 p.m. to 8:30 p.m. every Monday through Thursday. Price also taught Gymnastics II, a one-credit physical education class held from 1:00 p.m. to 1:50 p.m. every Monday and Wednesday. Although Patterson was not enrolled in Gymnastics II, he began attending the class in the fall of 2007 to practice tumbling, a form of gymnastics used in cheerleading. Price also permitted

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

other cheerleaders who were not enrolled in Gymnastics II to attend the class. The following semester, Patterson officially enrolled in Gymnastics II. On January 23, 2008, Patterson was attempting to perform a round-off back-handspring back tuck as part of a graded skills exam in Gymnastics II when he fell and injured his spinal cord, rendering him an incomplete quadriplegic.

Mutual provides a Catastrophic Injury Blanket Insurance Policy (the Policy) to NCAA member schools, including Prairie View. The Policy covers student cheerleaders participating in certain "Covered Event[s]." The Policy defines "Covered Event" as follows:

> Covered Event means, for Student cheerleaders:
>
> a. activities performed as part of the cheer unit for a Qualifying Intercollegiate Sport team competition scheduled by the Insured Person's Participating School; or
>
> b. practice sessions and pep rallies both of which must be authorized by, organized by and directly supervised by a safety-certified official coach or advisor of the Insured Person's Participating School, other than a member of the cheer unit or other undergraduate Student, and in preparation for a Qualifying Intercollegiate Sport team competition. . . .
>
> For Student cheerleaders, Covered Event does not include any activities not directly associated with the activities of a Qualifying Intercollegiate Sport team, such as camps, clinics, national competitions, fund-raisers, alumni events and other events not conducted by the Insured Person's Participating School.

Patterson sued Mutual seeking a declaration that the Policy covered his injury. Both parties filed for summary judgment. The district court concluded that, as a matter of law, the term "practice session" encompassed Patterson's activities during

Gymnastics II, but the court denied Patterson's motion for summary judgment after finding that a factual dispute remained over whether Patterson was a member of the Prairie View cheerleading team at the time he was injured. After the parties stipulated that Patterson was a member of the cheerleading team when he was injured, the district court granted summary judgment to Patterson. Mutual then appealed the district court's conclusion that Patterson was injured during a "practice session" under the terms of the Policy.

## II.

"We review de novo a district court's interpretation of an insurance contract and its decision to grant summary judgment." Land O' Lakes, Inc. v. Empl'rs Ins. Co. of Wausau, 728 F.3d 822, 827 (8th Cir. 2013). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that Indiana contract law governs the interpretation of the Policy.

We interpret terms in an insurance policy from the perspective of an ordinary policyholder of average intelligence. Bradshaw v. Chandler, 916 N.E.2d 163, 166 (Ind. 2009) (quoting Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d 243, 246 (Ind. 2005)). When language in an insurance policy is clear and unambiguous, we give it its plain and ordinary meaning. Id. We construe ambiguous language in favor of the insured party, particularly when such language purports to exclude coverage. Id. "As with other contracts, the interpretation of an insurance policy is generally a question of law for the courts to decide, even if the policy contains an ambiguity needing resolution." Town of Orland v. Nat'l Fire & Cas. Co., 726 N.E.2d 364, 369 (Ind. Ct. App. 2000). Thus, the presence of an ambiguity in an insurance policy does not preclude summary judgment if we are able to resolve that ambiguity "without the aid of a factual determination." City of Lawrenceburg v. Milestone Contractors, L.P., 809 N.E.2d 879, 883 (Ind. Ct. App. 2004).

The Policy contemplates four basic requirements for coverage relevant to this appeal: (1) the student must be injured during a practice session; (2) the practice session must be authorized, organized, and supervised by the coach; (3) the practice session must take place in preparation for a Qualifying Intercollegiate Sport team competition; and (4) the practice session must be directly related to the activities of a Qualifying Intercollegiate Sport team. We analyze each requirement in turn to determine if Patterson qualifies for coverage.

A.

We first address whether Gymnastics II can be considered a "practice session" under the Policy. The Policy itself does not define the term "practice session," so we must do so ourselves from the perspective of an ordinary policyholder. Indiana courts often refer to dictionaries to aid in this task. See, e.g., USA Life One Ins. Co. of Ind. v. Nuckolls, 682 N.E.2d 534, 540 (Ind. 1997). Merriam-Webster's Collegiate Dictionary defines "practice" as "systematic exercise for proficiency" and "session" as "a meeting or period devoted to a particular activity." Merriam-Webster's Collegiate Dictionary 914, 1071 (10th ed. 1998).

Patterson's activities during Gymnastics II fit this definition. For student cheerleaders like Patterson, Gymnastics II was a "meeting or period devoted to" the "systematic exercise for proficiency" of gymnastic skills used in cheerleading. Of course, these bare dictionary definitions do not capture every facet of the term "practice session" as it is used in the Policy. For example, the Policy does not cover cheerleaders who are injured during a meeting devoted to the systematic exercise of an activity totally unrelated to a sports event. These additional requirements are reflected in the Policy itself, which explicitly limits which practice sessions are covered under the Policy, for instance by requiring that the practice session take place in preparation for an intercollegiate sports competition. We take up these limitations later in the opinion.

-5-

Mutual argues, however, that we should read in additional limits on the definition of "practice session" to account for differences between Gymnastics II and the mandatory cheerleading practices held after school. Mutual asserts, for instance, that cheerleaders were required to attend after-school practice but not Gymnastics II; that students had to try out for cheerleading, while Gymnastics II was open to all students; that cheerleading practice and Gymnastics II were held at different times and at different places; that only seven of the thirty-five skills learned in Gymnastics II were used in cheerleading; and that students received academic credit for Gymnastics II but not for cheerleading.

The Policy does not contemplate any of these requirements for coverage, nor has Mutual offered any definition or common understanding of the words "practice" or "session" that includes these requirements. Mutual has demonstrated that cheerleading practice during Gymnastics II differs from cheerleading practice after school. Mutual has not shown, however, that this difference matters. Practice sessions need not be homogenous: they may take place at different times and at different places, they may involve different members of a team, they may cover different skills, and they may be optional or mandatory.

Moreover, the fact that Gymnastics II is a class does not mean it cannot also be a practice session. On the day Patterson was injured, there were six cheerleaders and six Gymnastics II students in the gym, but there were only eight students in the gym total. This apparent mathematical contradiction disappears with the understanding that Gymnastics II and cheerleading practice were taking place simultaneously and that some students (including Patterson) were participating in both a class and a cheerleading practice. As the following Venn diagram shows, Patterson was in the region of overlap.



Gymnastics II | Cheerleading Practice

Two students | Four student-cheerleaders | Two cheerleaders

Case law includes examples of similar overlaps between academics and interscholastic athletics. See, e.g., Foster v. Houston Gen. Ins. Co., 407 So. 2d 759, 761 (La. Ct. App. 1981) (describing "practice sessions held during the regular physical education class period"); Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 404 (5th Cir. 1995); Hanson v. Reedley Joint Union High Sch. Dist., 111 P.2d 415, 416 (Cal. Ct. App. 1941). But see State ex rel. Ind. High Sch. Athletic Ass'n v. Lawrence Circuit Court, 162 N.E.2d 250, 253-55 (Ind. 1959), overruled in part by Haas v. S. Bend Cmty. Sch. Corp., 289 N.E.2d 495, 497 (Ind. 1972) (suggesting that physical education does not include interscholastic athletics). Indeed, some schools allow students to fulfill curricular physical education requirements by participating in extracurricular activities. See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 301 (2001) (noting a state education board's "willingness to allow students to satisfy its physical education requirement by taking part in interscholastic athletics"); Doe, 70 F.3d at 404; Hanson, 111 P.2d at 416. Given this close relationship between modern interscholastic athletics and academics,

we find Mutual's proffered definition of "practice session," which draws a bright line between the two spheres, to be too rigid.

Indeed, it appears that Price himself contemplated some overlap between academics and intercollegiate athletics during Gymnastics II. Cheerleaders who were enrolled in Gymnastics II practiced skills during class that were substantially similar to those they would practice after school. Cheerleaders who were not enrolled in the class routinely attended the class. Patterson himself began attending Gymnastics II before he was ever enrolled in the class. Price frequently discussed what would occur at the after-school cheerleading practice during class. Meanwhile, Gymnastics II students who were not on the cheerleading team practiced gymnastics apart from the rest of the class. An ordinary policyholder who walked into the gym between 1:00 p.m. and 1:50 p.m. on a Monday or Wednesday would probably believe that he was witnessing a cheerleading practice session. To exclude these activities from coverage simply because the students were earning academic credit would impose a limitation that reflects neither the language of the Policy nor the reality of the class.

Mutual argues that defining "practice session" to include a physical education class would extend coverage to a risk that was not contemplated by the parties. We find this argument unpersuasive. The risk to Mutual from a cheerleading practice session is the same regardless of whether cheerleaders receive academic credit for the practice. To read the Policy as providing coverage for this particular class does not substantially expand the scope of Mutual's liability, for most physical education classes will not qualify for coverage simply because they do not involve student-athletes training in concert for their specific sport. And even class periods that constitute practice sessions will rarely qualify for coverage because Mutual has set strict limits on coverage beyond the requirement that the injury occur during a practice session. It is to these limits that we next turn.

B.

The first of these additional requirements is that Price authorize, supervise, and organize the cheerleading activities during Gymnastics II. Mutual argues that Price did not authorize these activities because he lacked the authority to determine whether to offer Gymnastics II as a class and did not decide when and where to schedule Gymnastics II.

This argument proves too much. Price also lacked the authority to determine whether to offer cheerleading as an extracurricular activity, so if Mutual is correct that a coach's authority must include the discretion to offer the activity itself, then Mutual's policy excludes the entire Prairie View cheerleading program from coverage. Similarly, a requirement that the coach determine the practice schedule would exclude coverage for any practice session whose timing is determined by a school administrator instead of a coach. Some colleges may find it advantageous to centralize the task of scheduling within a single department to minimize conflicts between curricular and extracurricular activities, and though the record does not reflect the extent to which that occurred in this case, we do not believe the Policy was designed to penalize a school for implementing such a system.

More relevant to our inquiry is Price's role in authorizing the activities that took place during Gymnastics II. In this respect, Price had almost plenary authority. Although the class had a syllabus, Price frequently departed from the syllabus and tailored instruction to the abilities and needs of the class, providing considerable one-on-one instruction to each student. Moreover, Price permitted cheerleaders who were not enrolled in Gymnastics II to attend the class. Price thus had some authority over who attended the class and who did not. As noted above, on the day Patterson was injured there were just as many cheerleaders under Price's watch as there were Gymnastics II students. Prairie View may have decided to offer Gymnastics II as a class and to schedule it from 1:00 p.m. to 1:50 p.m, but it was Price who decided to

turn the class into a cheerleading practice session by teaching tumbling routines used in cheerleading, allowing non-enrolled cheerleaders to attend, and discussing cheerleading business during class. In short, Prairie View authorized Gymnastics II, but Price authorized the cheerleading practice.

C.

We next address whether the cheerleading activities during Gymnastics II were performed "in preparation for a Qualifying Intercollegiate Sport team competition." The parties do not dispute that Prairie View's football and basketball programs are Qualifying Intercollegiate Sports under the Policy. The record is silent as to whether Patterson intended to use the round-off back-handspring back tuck he was practicing in Gymnastics II at a specific football or basketball game in the future, but it is undisputed that Prairie View cheerleaders used tumbling routines during football and basketball games and that Patterson was performing a tumbling maneuver when he injured himself. Just as we would not require a basketball player injured during a layup drill to prove that he would have attempted a layup during the next game to establish coverage under Mutual's policy, we will not require Patterson to point to a specific game in the future at which he would have performed the exact routine he was practicing. Were we to impose such a requirement, cheerleaders at after-school practice would have to consider, for insurance purposes, whether they were scheduled to perform each particular drill at a specific game in the near future. This would defeat one of the central purposes of insurance, which is to provide the policyholder peace of mind. It is enough for our purposes to note that Patterson was practicing tumbling during the basketball season and that Prairie View cheerleaders performed tumbling routines during home basketball games.

Mutual argues that because Patterson was performing a tumbling routine for a grade when he was injured, he could not have been practicing a tumbling routine in preparation for a Qualifying Intercollegiate Sport team competition. This argument

-10-

again assumes that academics and intercollegiate athletics may never overlap. Patterson was tumbling for a grade, yes, but that does not mean he was not also tumbling in preparation for a game. The fact that Patterson began attending Gymnastics II before he was ever enrolled in the class suggests that his primary purpose in taking the class was to improve his skills as a cheerleader rather than to learn gymnastics; the grade he received for the class was ancillary to this benefit. Indeed, Mutual acknowledges that cheerleaders who took Gymnastics II were routinely awarded "A's," so we doubt that Patterson was overly concerned about his grade when he began his routine on that day.

D.

Lastly, we address whether the activities during Gymnastics II were "directly associated with the activities of a Qualifying Intercollegiate Sport team." As an initial matter, it is difficult to imagine a scenario where the conclusion that Patterson was preparing for a Qualifying Intercollegiate Sport team competition does not compel the conclusion that his activities were "directly associated" with a Qualifying Intercollegiate Sport team. In any event, we believe this requirement is satisfied. As examples of activities not directly associated with sport team competitions, the Policy lists "camps, clinics, national competitions, fund-raisers, alumni events and other events not conducted by the Insured Person's Participating School." Patterson's activities during Gymnastics II do not fall into any of these categories. Patterson was practicing a tumbling routine during the basketball season, and tumbling routines were used in cheers during games. We conclude that the relationship between what Patterson was practicing when he was injured and why he was practicing it was sufficiently close to establish that the activities during Gymnastics II were "directly associated" with a Qualifying Intercollegiate Sport team competition.

-11-

### III.

The judgment is affirmed.

_____