# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1192
No. 14-1194

_____

Hot Stuff Foods, LLC

*Plaintiff - Appellee / Cross-Appellant*

v.

Houston Casualty Company

*Defendant - Appellant / Cross-Appellee*

_____

Appeals from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: September 23, 2014
Filed: November 17, 2014

_____

Before RILEY, Chief Judge, LOKEN and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Hot Stuff Foods manufactures and sells consumer food products including Sausage Breakfast Sandwiches assembled at its processing facility in Shakopee, Minnesota. Hot Stuff uses sausage for the Sausage Breakfast Sandwiches that does not contain monosodium glutamate (MSG), a flavor enhancer that must be disclosed on a food product's label when it is an added ingredient. See 21 U.S.C. § 343(i). Hot

Stuff also distributes sausage that contains MSG from its facility in Sioux Falls, South Dakota. On January 7, 2011, Hot Stuff discovered it had inadvertently used Sioux Falls sausage in making Breakfast Sandwiches distributed from Shakopee after July 2010. As those products contained MSG not disclosed on the labels, they were "misbranded" under federal law. 21 U.S.C. § 343(a)(1). Hot Stuff immediately reported the situation to representatives of the Food and Drug Administration and the U.S. Department of Agriculture. After discussions with both agencies, Hot Stuff conducted a voluntary recall of the mislabeled sandwiches. The recall encompassed 193,507 cases of Sausage Breakfast Sandwiches that Hot Stuff distributed between August 2010 and early January 2011. During the recall, Hot Stuff learned that approximately 40,000 cases of the mislabeled sandwiches remained in commerce.

At the time of the recall, Hot Stuff was insured under a Malicious Product Tampering/Accidental Product Contamination policy issued by Houston Casualty Company (HCC). HCC's policy defined "Accidental Product Contamination" as:

> (1) any accidental or unintentional contamination, impairment or mislabeling . . . during the manufacture . . . labeling . . . production or processing . . . of the Named Insured's PRODUCTS (including their ingredients or components), or PUBLICITY implying such, or
>
> (2) fault in design specification or performance . . .
>
> provided always that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property . . . .

Hot Stuff timely sought indemnification from HCC for losses sustained due to the recall. HCC denied coverage on the ground that the claim did not involve an

-2-

"Accidental Product Contamination" as defined in the policy. Hot Stuff commenced this declaratory judgment action to recover its claimed loss.

The district court granted Hot Stuff's motion for partial summary judgment, concluding that the incident was a covered Accidental Product Contamination, Hot Stuff was entitled to indemnification of its covered losses, and the amount of damages required a jury trial. Hot Stuff Foods, LLC v. Houston Cas. Co., No. 11-4055, 2012 WL 2675225 (D.S.D. July 5, 2012). After a four-day trial, the jury awarded Hot Stuff $755,268.07 for recall and crisis response expenses and $200,000 for lost gross profit. HCC moved for judgment as a matter of law with regard to the lost gross profit award, and Hot Stuff moved for an award of attorney's fees under S.D. Codified Laws § 58-12-3 for HCC's vexatious refusal to pay. The district court denied both motions. HCC appeals the grant of partial summary judgment and the award of lost gross profit damages. Hot Stuff cross appeals the denial of attorney's fees. We reverse the grant of partial summary judgment, affirm on the remaining issues, and remand.

## I. The Coverage Issue

"We review de novo a district court's interpretation of an insurance contract and its decision to grant summary judgment." Patterson v. Mut. of Omaha Ins. Co., 743 F.3d 1160, 1163 (8th Cir. 2014). It is undisputed that (i) the Sausage Breakfast Sandwiches were mislabeled, and (ii) no one reported becoming ill from eating them. Therefore, the parties and the district court agreed that the determinative coverage question was whether consumption of Sausage Breakfast Sandwiches to which between 0.0638 grams and 0.1276 grams of MSG had been added "*may likely result*" in "physical symptoms of bodily injury, sickness or disease [in] any person(s)" (emphasis added).

The parties filed cross motions for summary judgment on this issue. Hot Stuff argued that it need show only a possibility that consumption of one or more Sausage

-3-

Breakfast Sandwiches containing that amount of MSG would cause physical injury or illness. HCC argued that Hot Stuff must show a probability such harm would result. The district court adopted Hot Stuff's interpretation of the coverage limitation. As a matter of plain meaning, the court reasoned, the words may and likely "essentially balance each other out and leave the impression that 'may likely' means that there is a chance that an illness or sickness will result." Alternatively, the two words conflict, making the "may likely" term ambiguous. Resolving the ambiguity in favor of the insured, as South Dakota law requires, the court ruled that Hot Stuff need only show "a possibility or a slight chance" that "a person will experience physical symptoms of sickness as a result of ingesting MSG-filled sandwiches." Reviewing the parties' conflicting expert opinions regarding the health effects of ingesting MSG, the court concluded that "Hot Stuff has brought forth sufficient scientific evidence to show that MSG could cause physical symptoms of illness or sickness in at least one person who is exposed to the mislabeled sandwich."

**A. Construing the Policy Language.** The parties agree South Dakota law governs this issue. Under South Dakota law, the meaning of terms in an insurance policy is a question of law we review *de novo*. Opperman v. Heritage Mut. Ins. Co., 566 N.W.2d 487, 489-91 (S.D. 1997). "The goal of contract interpretation is to determine the parties' intent." Tri-City Assocs., L.P. v. Belmont, Inc., 845 N.W.2d 911, 915 (S.D. 2014). Terms "must be read in the context of the agreement as a whole." Goddard v. S.D. Pub. Assur. Alliance, 687 F.3d 965, 968 (8th Cir. 2012). We have found no Supreme Court of South Dakota decision interpreting "may likely." Thus, our task is to predict how that Court would resolve the issue. See Allstate Indem. Co. v. Rice, 755 F.3d 621, 623-24 (8th Cir. 2014).

HCC's policy has separate coverage sections for Malicious Product Tampering and Accidental Product Contamination. In both sections, the first type of covered loss recited, and the type of loss defined in the greatest detail, is "Recall Expenses." At least some general commercial liability policies exclude losses incurred because

-4-

of a recall.  See Netherlands Ins. Co. v. Main St. Ingredients, LLC, 745 F.3d 909, 919 (8th Cir. 2014).  The need to recall contaminated or adulterated product is a recognized risk of doing business in the heavily regulated food industry.  Thus, the exclusion compels food companies such as Hot Stuff to purchase policies separately insuring against this risk.  This no doubt explains why HCC's narrow commercial policy focused on the coverage of recall expenses, and why courts have had to resolve accidental product contamination coverage disputes in recent years.[1]

Until 21 U.S.C. § 350l was enacted in 2011, neither FDA nor USDA had *mandatory* recall authority.  But both agencies included voluntary recall in their enforcement arsenal, FDA by regulation, 21 C.F.R. §§ 7.41-7.59, and USDA by Directive 8080.1 of the Food Safety and Inspection Service (Oct. 26, 2010).  Food and drug companies that refuse to conduct an agency-recommended voluntary recall risk facing the agencies' draconian enforcement powers, such as product seizure and adverse publicity.  While FDA and USDA focus first and foremost on public health and safety, both agencies also protect food consumers from unfair and deceptive marketing practices, such as improper labeling of food imports and non-disclosure of non-dangerous preservatives or flavorings.  Violation of these labeling restrictions results in the product being "misbranded" or "adulterated," in which case voluntary recall may be urged by the agencies or may be the company's least-costly remedy.  In regulating voluntary recalls, FSIS Directive 8080.1 identified three Recall Classifications, "whether firm-initiated or requested by FSIS."  A Class III recall is "a situation where the use of the product will not cause adverse health consequences."

---

[1] See Fresh Exp. Inc. v. Beazley Syndicate 2623/623 at Lloyd's, 131 Cal. Rptr. 3d 129 (Cal. App. 2012); Caudill Seed & Warehouse Co. v. Houston Cas. Co., 835 F. Supp. 2d 329 (W.D. Ky. 2011); Little Lady Foods, Inc. v. Houston Cas. Co., 819 F. Supp. 2d 759 (N.D. Ill. 2011); The Limited, Inc. v. Cigna Ins. Co., 228 F. Supp. 2d 574 (E.D. Pa. 2001); Ruiz Food Prods., Inc. v. Catlin Underwriting, No. 1:11-cv-00889, 2012 WL 4050001 (E.D. Cal. Sept. 13, 2012).

Here, Hot Stuff, the FDA, and USDA agreed that recall of the mislabeled Sausage Breakfast Sandwiches would be designated a Class III recall.

This brief (and necessarily incomplete) review of food industry regulation brings into focus why insurers and food industry insureds would agree to limit Accidental Product Contamination coverage to recall incidents in which consumption of the contaminated or mislabeled product "resulted, or may likely result" in physical symptoms of bodily injury, sickness or disease or death of any person. As other courts to consider this coverage have concluded, this "is not a recall insurance policy." Ruiz, 2012 WL 4050001, at *10; see The Limited, 228 F. Supp. 2d at 580. Covering voluntary recalls that have no direct relation to public health hazards would increase the cost of the insurance, extending coverage to voluntary actions that should remain part of an insured's cost of doing business.[2]

Construing the policy term "may likely result" in this light, we disagree with the district court that the words may and likely "essentially balance each other out," or conflict and therefore create an ambiguity. The court read "likely" out of the policy, contrary to the basic principle that insurance policies, like other contracts, should not be interpreted in a manner that renders any words meaningless. See Tri-City Assocs., 845 N.W.2d at 915; Demaray v. De Smet Farm Mut. Ins. Co., 801 N.W.2d 284, 289 (S.D. 2011) ("sudden and accidental" must be given separate meanings). Likewise, the parties' summary judgment motions urged erroneous interpretations; HCC argued that "may" should be ignored, while Hot Stuff urged the court to ignore "likely." In our view, the parties to this insurance contract fixed where in the range of product contamination risks coverage should end by choosing a term requiring more than a possibility of physical injury ("may"), but less than a

---

[2]In Little Lady Foods, 819 F. Supp. 2d at 763, the court observed that construing "may likely" to require only the possibility of harm would expand coverage to the point that "virtually every cost associated with quality control" could plausibly be considered covered under the policy.

probability ("likely"). The term is not ambiguous -- the words "reasonably likely to result" come to mind as capturing the concept -- though the standard may be hard to apply to ambiguous fact situations. "Insurance contracts warrant reasonable interpretation, in the context of the risks insured, without stretching terminology." Opperman, 566 N.W.2d at 490.

**B. The Grant of Summary Judgment.** Having concluded the district court misinterpreted a critical policy term, the question is whether the record nonetheless warrants summary judgment on the coverage issue. Summary judgment is granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Hot Stuff bore the burden of proving that consuming the mislabeled Sausage Breakfast Sandwiches "may likely result" in "physical symptoms of bodily injury, sickness or disease . . . of any person(s)." "That both sides move for summary judgment does not mean that there are no genuine issues, obliging a court to grant judgment for one side or the other." St. Paul Fire & Marine Ins. Co. v. Engelmann, 639 N.W.2d 192, 199 (S.D. 2002).

The issue is whether the presence of 0.06 to 0.13 grams of undisclosed MSG in the Sausage Breakfast Sandwiches that Hot Stuff distributed and then recalled "resulted, or may likely result in" physical symptoms of injury or illness in any of the persons who consumed those products. MSG is the sodium salt of glutamic acid. It is found naturally in our bodies and in foods containing protein. MSG in "free" form is also added to foods to enhance flavor. In 1959, the FDA classified MSG as a "generally recognized as safe" ingredient, like salt and baking powder. However, beginning in 1968, scientific literature and government studies have noted that some persons may experience adverse reactions to ingesting MSG -- a "Chinese restaurant syndrome" that may include headache, nausea, tingling and numbness, chest pain, and hives. Thus, there is a recognized relationship between MSG labeling and public health. FSIS Directive 8080.1, in explaining factors the agency evaluates in determining the public health significance of a mislabeling, lists MSG as a food to

which some people are intolerant, and cited this as a reason why "complete ingredient labeling is critical." Rev. 6, at 35-36.

In support of their cross motions for summary judgment, the parties submitted reports by immunology experts regarding the likelihood that the amount of MSG present in the mislabeled sandwiches would cause illness. The experts acknowledged the existence of government and private studies indicating that MSG can cause illness in specific sensitive subsets of the population. Hot Stuff's expert, Dr. Henry Fishman, cited a seminal 1995 FDA/FASEB study reporting that, although MSG is safe for most people, certain sensitive individuals, including asthmatics, have been shown to experience reactions from levels of MSG as low as 0.5 grams. Additionally, Dr. Fishman noted a recent double-blind, placebo-controlled study linking MSG in dosages of 0.4 grams to persistent rhinitis in a small subset of persons.

HCC's expert, Dr. Andrew Saxon, conceded that "there is some minimal evidence that MSG might cause [hives] in very rare subjects," and quoted a peer-reviewed article as stating that "there does appear to be some evidence to suggest that MSG may be a rare cause of [hives] and possibly [subcutaneous swelling]." The same article explained that two recent case reports "suggest a possible relationship between ingestion of MSG and the development of rhinitis." A. N. Williams & K. M. Woessner, Monosodium Glutamate "Allergy": Menace or Myth?, 39 Clinical & Experimental Allergy 640, 644 (2009). Dr. Saxon nonetheless concluded that the mislabeled breakfast sandwiches would not likely result in illness to any person.

"Generally, questions of whether the loss or injury was caused by a covered risk is a question for the jury. Similarly, whether . . . the loss falls within a policy definition is a question of fact." 17 Couch on Insurance § 246.10, at 246-26 (3d ed. 2005). The Supreme Court of South Dakota follows this principle. "Where there is a genuine issue of material fact precluding summary judgment on an insurance coverage question, the South Dakota Supreme Court has approved the submission of

the coverage question to a jury." IBP, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 299 F. Supp. 2d 1024, 1032 (D.S.D. 2003); see Headlee v. N.Y. Life Ins. Co., 12 N.W.2d 313, 317 (S.D. 1943) (whether the insured's death was accidental or a suicide "must be determined by the jury"). In our view, whether consumption of the mislabeled Sausage Breakfast Sandwiches "may likely result" in physical symptoms of sickness or disease is a genuine dispute of material fact that cannot be answered by a summary judgment record that consists of inconclusive government reports and scientific studies and the dueling opinions of experts far removed from the relevant marketplace. Apparently, some 150,000 cases of the slightly tainted products were consumed with no reported adverse health results. We note that, during voir dire of prospective jurors before the damages trial, three prospective jurors testified they carefully avoid foods containing MSG because of their personal experience with allergic reactions and headaches.

For these reasons, unless the district court determines on remand that summary judgment is appropriate based on the full trial record, the coverage question must be submitted to a jury. Cf. Deep Woods Holdings, L.L.C. v. Sav. Deposit Ins. Fund of the Rep. of Turkey, 745 F.3d 619, 623-24, 625 (2d Cir. 2014); Germany v. Vance, 868 F.2d 9, 20-21 (1st Cir. 1989). However, as the damage issues appear to be "distinct and separable" from the question of coverage, damages need not be retried, and we turn to the appeals of those issues. England v. Gulf & W. Mfg. Co., 728 F.2d 1026, 1029 (8th Cir. 1984).

## II. The Lost Gross Profit Issue

HCC's policy provided coverage for, "Loss of GROSS PROFIT incurred as a result of an ascertainable reduction in sales revenue caused solely and directly by an ACCIDENTAL PRODUCT CONTAMINATION." The policy defined gross profit as the difference between:

a) the revenue that could have been reasonably projected, but which has been lost solely and directly as a result of an ACCIDENTAL PRODUCT CONTAMINATION, and

b) the variable cost that would have been incurred, but which ha[s] been saved as a result of not making these sales (including the cost of raw materials, and all other saved costs).

At trial, Hot Stuff sought to recover lost gross profit of $199,604.02 attributable to "recall products" (products that were recalled) and $733,623.22 attributable to new products whose introduction and sale were allegedly hampered by the recall. The jury awarded Hot Stuff $200,000 for its claim of Lost Gross Profit.

On appeal, HCC argues the district court erred in denying judgment as a matter of law on the $200,000 lost gross profit award because the evidence was insufficient to allow the jury to determine lost profits "with reasonable or sufficient certainty." Olson v. Aldren, 170 N.W.2d 891, 895 (S.D. 1969).[3] HCC mounts a lengthy, detailed attack on Hot Stuff's method of estimating lost gross profit. But like the district court we must apply the standard of review the Supreme Court of South Dakota would apply in reviewing the sufficiency of a jury verdict. Parkhurst v. Belt, 567 F.3d 995, 1001 (8th Cir. 2009). Thus, we "determine only if there is competent and substantial evidence to support the verdict," viewing "the evidence and testimony in a light most favorable to the verdict." Bertelsen v. Allstate Ins. Co., 833 N.W.2d 545, 554 (S.D. 2013) (quotation omitted). Under South Dakota law, whether damages have been proven with reasonable certainty is a question for the trier of fact. Von Sternberg v. Caffee, 692 N.W.2d 549, 555 (S.D. 2005). "Any reasonable method of estimating a prospective profit is acceptable." Olson, 170 N.W.2d at 895.

---

[3]HCC does not appeal the jury's separately itemized award of $755,268.07 for Hot Stuff's "Recall Expense and Crisis Response/Consultant Expenses."

-10-

At trial, Steve Watkins, Hot Stuff's president and former CFO, presented Hot Stuff's lost gross profit claims and explained the method by which the amounts were calculated for the recall and new product categories. For recall products, Hot Stuff compared its 2010 and 2011 profits for each customer, "time adjusting" the 2010 figures for customers who bought for the first time during 2010. Hot Stuff then determined total lost gross profit by aggregating the profit differences for all customers whose 2010 time-adjusted profits exceeded their 2011 profits, excluding 2010 purchasers who were not ongoing customers. For new products, Hot Stuff compared actual 2011 gross profits with its projected profits for those new products. Watkins explained that the 2011 new product projections were developed at the end of 2010 as part of an annual, five-months-long planning process, based on consultations with customers, brokers, and distributors and reviewed by outside analysts before being approved by Hot Stuff's Board of Directors. In practice, Watkins testified, Hot Stuff's projections were accurate to within three or four percentage points.

Noting that Watkins was a lay witness, not an expert, HCC argues this testimony was inadmissible because it was based on "unsupported inferences and innuendo from a spreadsheet created for this litigation," rather than conclusions "based on the perception of the witness." See Fed. R. Evid. 701(a) (lay witness "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception"). Like most courts, including the Supreme Court of South Dakota, we will not reverse a district court for admitting testimony by a business owner or officer regarding lost profits when his "experience in the business provided the foundation for all the specifics to which he testified." Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 837 (8th Cir. 2005); see Olson, 170 N.W.2d at 895; Fed. R. Evid. 701 advisory committee's note. Here, Watkins had substantial business experience and intimate knowledge of Hot Stuff's operations. The district court did not abuse its discretion in admitting Watkins's lay testimony and opinions. See Allied Sys., Ltd. v. Teamsters Local 604, 304 F.3d 785, 792 (8th Cir. 2002). Watkins

was thoroughly cross examined, and the jury then determined what weight to afford his opinions in substantially reducing Hot Stuff's lost gross profit claim.

HCC's other challenges go to the weight of Hot Stuff's gross profit evidence, not its sufficiency. For recall products, HCC argues that Hot Stuff's claim was baseless because its 2011 profits exceeded overall 2010 profits and projected 2011 profits. However, HCC's policy defined covered losses to include lost gross profits from sales "that could have been reasonably projected." An overall increase in 2011 profits did not preclude the jury from finding that Hot Stuff nonetheless lost additional sales and gross profit due to the recall. Hot Stuff's central regional sales manager testified that some customers temporarily ceased ordering because of the recall. HCC also challenges Hot Stuff's method of "time adjusting" 2010 profits.[4] Making adjustments to compare part-year purchases in 2010 with full-year purchases in 2011 was a "reasonable method of estimating a prospective profit." Olson, 170 N.W.2d at 895. It was for the jury to decide what weight that method deserved.

For new products, HCC argues that Hot Stuff's sales projections were too speculative to support a lost profits determination. We disagree. Hot Stuff compared actual sales during and after the recall with sales projections that were part of its normal planning process. The projections were based on the company's evaluation of customer needs, were assessed by outside analysts, and had proved accurate in the past. Hot Stuff managers testified that most of the "new" products were slightly modified versions of well-established products with proven sales records.

Second, HCC contends that Hot Stuff failed to show direct causation between the recall and lost gross profit on new products, as the policy required, because the

---

[4]Hot Stuff determined the average monthly purchases following a customer's first purchase in 2010, then multiplied that average by twelve to estimate the full year's gross profit that it compared to the customer's full-year gross profit in 2011.

"supposed ripple effects of a recall of unrelated products . . . is, at best, a theory of indirect causation." This is false semantics. Hot Stuff presented evidence that the recall crisis forced employees to delay the introduction of new products and frustrated critical marketing efforts. If believed, that was evidence of a "direct" causal connection. The alleged "ripple effects" were supported by two regional sales managers, who testified that all employees needed to assist with the recall, preventing the company from adequately marketing at important trade shows, which led to reduced sales. As the district court observed in denying judgment as a matter of law, "it was an issue for the jury to decide." HCC's vigorous cross examination of Hot Stuff's lost gross profit witnesses was obviously not lost on the jury, because it severely discounted Hot Stuff's lost profit calculations.

After careful review of the four-day trial record, we conclude the district court did not err when it denied HCC's motion for judgment as a matter of law.

### III. The Attorney's Fee Issue

Hot Stuff cross appeals the district court's denial of an attorney's fee award under S.D. Codified Laws § 58-12-3, which allows an insured to recover attorney's fees "if it appears from the evidence that [the insurer] has refused to pay the full amount of [the] loss, and that such refusal is vexatious or without reasonable cause."[5] The district court denied an award because (i) HCC never conceded that Hot Stuff suffered any loss covered by the policy; (ii) HCC had a "bona fide and reasonable factual ground" to contest the total damages claimed by Hot Stuff, Howie v. Pennington County, 563 N.W.2d 116, 119 (S.D. 1997); and (iii) Hot Stuff would have incurred the same attorney's fees pursuing its full damage claim at trial even if HCC

---

[5]Hot Stuff devoted less than six pages to the cross appeal in its initial brief, then filed a twenty-three page Reply Brief vastly expanding its arguments on this issue. We deplore this kind of appellate sandbagging and would have been inclined to strike the Reply Brief had we been asked to do so.

had conceded a lesser covered loss after the grant of summary judgment on the coverage issue. We review the district court's decision for clear error. Bjornestad v. Progressive N. Ins. Co., 664 F.3d 1195, 1198-99 (8th Cir. 2011).

Hot Stuff first argues that HCC's persistent denial of coverage was a vexatious refusal to pay warranting an attorney's fee award under § 58-12-3. We disagree. HCC consistently denied that Hot Stuff suffered a loss covered by the policy. As our reversal of summary judgment on this issue makes clear, HCC's position was not indefensible. See also Little Lady Foods, 819 F. Supp. 2d at 763. And HCC was entitled to appeal the district court's adverse grant of summary judgment. See All Nation Ins. Co. v. Brown, 363 N.W.2d 216, 218 (S.D. 1985); Hawkeye-Sec. Ins. Co. v. Davis, 277 F.2d 765, 772 (8th Cir. 1960).

In its Reply Brief, Hot Stuff argues, alternatively, that HCC's attorney in closing argument urged the jury to limit its award to $417,758.06 in recall expenses. When "the crucible of the summary judgment process showed HCC's denial of coverage to be without reasonable cause," Hot Stuff argues, HCC's failure to immediately pay Hot Stuff the undisputed amount of $417,758.06 was vexatious and unreasonable. We normally decline to consider issues first raised in a reply brief, but we prefer to reject this contention for its lack of merit.

"Where there are open questions of fact or law determinative of the insured's liability, the insurer, acting in good faith, may insist on judicial determination of such questions without subjecting itself to penalties for vexatious refusal to pay." Howie, 563 N.W.2d at 119 (alterations omitted). Here, HCC in good faith took the position that Hot Stuff's Class III recall was a sound business decision but not a covered loss. When the district court ruled that the recall responded to a covered Accidental Product Contamination, Hot Stuff went to trial claiming $1.6 million in covered losses. At the end of a hard-fought damage trial, HCC argued to the jury that only fifty-five percent of the claimed recall expenses were reasonable and necessary, and

-14-

none of the claimed lost gross profits should be awarded. We agree with the district court this did not turn HCC's failure to offer to pay the "uncontested" amount into a vexatious "refus[al] to pay the full amount of such loss" within the meaning of § 58-12-3. This was not a case where the insurer valued the insured's claim "much higher than its offer," or engaged in long delay and then "tendered a settlement offer far below the amount due." Tripp v. W. Nat'l Mut. Ins. Co., 664 F.3d 1200, 1207-08 (8th Cir. 2011). There was no clear error in denying an award of attorney's fees.

The judgment of the district court is reversed in part and the case is remanded for further proceedings not inconsistent with this opinion.

_____